195 A.2d 759 (1963)
In the Matter of the OSTEOPATHIC HOSPITAL ASSOCIATION OF DELAWARE.
Supreme Court of Delaware.
November 20, 1963.
Ernest S. Wilson, Jr., Wilmington, and James M. Tunnell, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, for appellants.
David F. Anderson, of Berl, Potter & Anderson, Wilmington, for appellees.
TERRY, C. J., and WOLCOTT and CAREY, JJ., sitting.
*760 TERRY, Chief Justice.
The Osteopathic Hospital Association of Delaware was organized in 1946 as a membership corporation, its primary object being to provide surgical and medical services and care and nursing for persons in need thereof. It presently operates the Riverside Hospital in Wilmington, Delaware.
Under the bylaws of this association the attendance of two-thirds of all members of the corporation is required for a quorum at the annual meeting. In 1962 attempts were made to convene such a meeting, but all failed for lack of a quorum. Because of these unsuccessful efforts, a lay member of the Board of Trustees brought this action pursuant to 8 Del.C., Sec. 224. Its pertinent provisions are as follows:
"* * * No failure to elect directors, or in the case of a corporation without capital stock, * * * trustees or governing body, at the designated time shall work any forfeiture or dissolution of the corporation, but the Court of Chancery may summarily order an election to be held upon the application of * * * any member of the corporation, * * * the members, represented at said meeting, either in person or by proxy, shall constitute a quorum for the purpose of such meeting, notwithstanding any provision of the by-laws of the corporation to the contrary." (Emphasis supplied.)
The respondent in this case is the Osteopathic Hospital Association of Delaware. Replying to the petition filed by a trustee, *761 who, as required by the above-cited statutory provision, must also be a member of the Association, the respondent answered by admitting petitioner's allegations as filed in his complaint and expressed no opposition to the issuance of the requested order.
Thereafter, three osteopathic physicians, who alleged that they were members of the Association, petitioned for and were granted leave to intervene on behalf of themselves and all other members similarly situated to oppose the relief sought by the original petitioner. These three osteopathic physicians are thus the intervenors to this action. Their basic contention is that petitioner is not a member of the Association and therefore is not entitled to vote at any meeting of the members of the corporation.
In view of this contention advanced by intervenors, the Court of Chancery delayed the issuance of a final order to call a meeting of the members of the Association until the issues raised by the parties were resolved.
A description of the factual background concerning the organization of this Association will aid in understanding the nature of this controversy.
As previously stated, this corporation was created for medical purposes. The pertinent provisions of its certificate of incorporation, as they pertain to the disputed issues before us, are as follows:
"Fourth. This corporation shall not be for profit, and it shall have no capital stock. It shall be a membership corporation governed by a Board of Trustees, * * * and it shall be composed of such members as the Board of Trustees pursuant to the provisions of the bylaws relating thereto, may from time to time elect."
"Fifth. The bylaws of the association shall provide for the regulation of the affairs of the corporation, shall establish rules and conditions for the admission of members and shall fix the amount of dues, fines, and assessments. * * *"
In addition to the above-cited articles, the certificate of incorporation also provides in Article Tenth thereof that the Board of Trustees have the authority to alter or amend the bylaws of the Association.
There has been much discussion in the briefs, as well as mention thereof in the Chancellor's opinion, concerning the organizational structure of the Association from the time of its founding in 1946 until the enactment of certain bylaws in 1955. It appears from the briefs that all parties concede the minutes of the Board of Trustees prior to 1955 are too confused or disorganized to offer any help in the resolution of the issues at bar. For that reason they stipulated in the lower court that only those bylaws which were enacted in 1955, would constitute the basis upon which they intended to found their arguments. We will therefore limit ourselves to a consideration of the certificate of incorporation and such bylaws as were enacted by the Board of Trustees from 1955 to the time this controversy arose.
The 1955 bylaws, as pertain to membership in the Association, provided for voting members who were doctors licensed by the Medical Council of Delaware as osteopathic physicians authorized to practice in this State and who have contributed $1,000 to the Association. In addition, laymen were also admitted as members of the Association if elected by a majority vote of the members of the Osteopathic Association of Delaware, and the term of membership of such laymen was set at three years. These bylaws also listed various classes of nonvoting members.
Further, they provided for a Board of Trustees composed of 21 persons to be elected at the annual meeting of the corporation, and a quorum consisted of 11 members. Finally, these bylaws provided for amendment thereof by a two-thirds majority *762 vote of the Board of Trustees, at any regular meeting, provided a full statement of such proposed amendment shall have been published in the notice calling the meeting.
There is some dispute whether these 1955 bylaws were ever duly adopted by the members of the Association. Irrespective of that, the members of the Association acted in accordance with such bylaws for more than six years. In particular, laymen were continuously elected to the Board under these 1955 bylaws. All parties concede the validity of these bylaws even though certain procedural requirements for their proper enactment were not observed at the time of their passage. Notwithstanding this concession, our courts have long held that bylaws may be amended or established by custom or by acquiescence in a course of conduct by those authorized to enact them. Star Loan Association v. Moore, 4 Pennewill 308, 55 A. 946 (1903). Chancellor Harrington stated the rule in the following terms:
"Ordinarily, a corporate by-law may be amended by implication and without any formal action being taken by clear proof of a definite and uniform custom or usage, not in accord with the by-laws regularly adopted, and by acquiescence therein; but usually the course of conduct relied on to effect the change must have continued for such a period of time as will justify the inference that the stockholders had knowledge thereof and impliedly consented thereto." In re Ivey & Ellington, Inc., 28 Del.Ch. 298, 42 A.2d 508 (1945).
We specifically reaffirm this principle. In view of the six-year period under which this Association continued to function, during which the membership accepted and acted pursuant to the 1955 bylaws, the facts amply justify the conclusion that they are valid.
The next change in these bylaws occurred on April 21, 1960. At a meeting of the Board of Trustees on that date, 17 of whom were present, the quorum requirement for their meeting was changed from 11 to 7 members thereof. The intervenors admit the validity of this amendment.
On December 21, 1961, there was a further change to the bylaws which now forms the basis of the controversy before us. At a regularly called meeting on that date, notice having been given of the proposed amendment, the trustees amended the bylaws to making all members of the Board of Trustees full voting members of the Association. Nine members of the Board of Trustees were present at this meeting  8 voted in favor of the amendment and 1 against.
In the Court of Chancery the intervenors contended that this amendment required a two-thirds vote of the full Board (i. e., at least 14 members in favor), and also that the bylaw was unreasonable. The Chancellor ruled in favor of the intervenors on the latter issue, but held that in the presence of a quorum, an amendment to the bylaws could be effected by a vote of two-thirds of those trustees who are present and voting.
Prior to this amendment on December 21, 1961, four lay trustees had been elected as voting members of the Association under the 1955 bylaws. With the 1961 amendment, 12 additional lay trustees were made voting members of the Association. According to the membership rolls submitted in the Court of Chancery there are 23 osteopathic physicians who are full voting members of the Association and 16 laymen in the same category. Twelve of these laymen are those who became members by virtue of the 1961 amendment, while the other 4 were elected to voting membership in the Association under provisions of the 1955 bylaws.
The following issues are thus before us on appeal:
1. Was the 1961 amendment to the bylaws valid, although passed by more than two-thirds of those trustees present and voting, but less *763 than two-thirds of the full membership of the Board of Trustees?
2. Was the 1961 amendment, purporting to make all lay members of the Board of Trustees full voting members of the Association, legally unreasonable?
Turning to the first point, the statutory law of this State provides:
"The number of directors which shall constitute the whole board shall be such as from time to time shall be fixed by, or in the manner provided in, the by-laws, but in no case shall the number be less than 3, * * and a majority of them shall constitute a quorum for the transaction of business, unless the by-laws shall provide that a different number shall constitute a quorum, which in no case shall be less than one-third of the total number of directors * * *." 8 Del.C., Sec. 141 as amended.
Hence, despite a Board of Trustees with a total membership of 21 persons, the bylaw provision requiring the presence of only 7 members thereof to constitute a quorum, was clearly valid, and that number could transact any business which was legally brought before it. The bylaws further provide for amendment thereof by a two-thirds majority vote of the Board of Trustees at any regular meeting. Thus in the absence of more specific terminology in the bylaws themselves, a provision such as described above, means two-thirds of those trustees who are present and voting. The existence of a quorum confers legality on the meeting of the trustees  assuming, of course, that other basic requirements of notice, etc., have been observed. It strikes us that in the absence of limitations in the charter or bylaws any business which has been properly brought before the meeting may be transacted by those trustees who are present and voting. Thus, as here, in the absence of a requirement that two-thirds of the full Board of Trustees must concur to amend the bylaws, a vote of two-thirds of those trustees present and voting is sufficient. One legal autority has stated the rule as follows:
"When changes in the by-laws or regulations of a corporation are adopted at a meeting, the meeting must be a legal one at which a quorum for the purpose is present, and the changes must be adopted by a majority vote of the * * * directors, * * * or by a greater vote than a mere majority when this is required by the * * * existing * * * by-laws." 18 C.J.S. Corporations § 188, p. 601. (Emphasis added.)
Nowhere have we found any rule, as suggested by the intervenors, that more than two-thirds of the quorum was necessary to amend the bylaws. The intervenors have certainly not cited any authority to substantiate their argument in this regard.
In his opinion below, the Chancellor stated the rule thusly:
"In the absence of evidence to the contrary, the By-Laws is to be interpreted as requiring only a majority (in the present case, a two-thirds majority) of all the votes cast. * * * This is in keeping with the notion that the actions of executive boards ought not to be encumbered by such stringent voting requirements that because of the absence or indifference of certain members they are thereby made incapable of transacting the corporation's business. The danger that a small minority may take actions which are not supported by a majority of the board is mitigated in the ordinary case, as it was here, by the requirement that notice be given prior to the meeting of the proposals to be there considered."
*764 We therefore affirm the decision of the Chancellor on this point.
In his opinion below, the Chancellor declared that the 1961 bylaw amendment, purporting to make all lay members of the Board of Trustees full voting members of the Association, was legally unreasonable.
By virtue of that ruling, the Chancellor rendered judgment in favor of the intervenor and ordered that only those who were elected to membership in the Association prior to the 1961 amendment were entitled to vote at its annual meeting.
The petitioner below, appeals from that ruling of the Chancellor. We now turn to consider this issue.
The basic argument of the petitioner-appellant is centered around the following language appearing in the Chancellor's ruling:
"It may be that the trustees voting on such proposal acted with the highest motives and in the best interest of the corporation, but the possibility of abuse is real. I am persuaded that a change of so fundamental a character in the structure of this rather unique organization could not validly be carried into effect by the unilateral action of the trustees taken here. Something more is necessary to validate such an amendment where, as here, there is a sudden departure from the past form of corporate organization coupled with a complete absence of affirmative action by the group whose interests are adversely affected."
While we recognize that no issue has been raised by the intervenors that the trustees acted out of some ulterior motive, which in and of itself would constitute a breach of their fiduciary relationship and render the 1961 bylaw amendment void, we are constrained to agree with the Chancellor that the acts of the trustees are out of context with the basic organizational structure of this organization. Moreover, the dangers inherent in these changes were descriptively set forth by the lower court as follows:
"By virtue of this amendment the Trustees, who occupy a fiduciary position in relation to the corporate membership, have seriously impaired a valuable right of these members under circumstances suggesting opposition by at least a majority of such `members'. Moreover, by making themselves voting members of the corporation, they have obtained for themselves the capability of indefinitely maintaining control over the corporation's affairs. Parenthetically, the board members impliedly concede that this was their objective."
This is not a novel situation when corporate disputes arise. Nor is the law undeveloped on how to remedy the problem. In line with the above-cited portion of the Chancellor's opinion one legal authority states the rule as follows:
§ 188a. "* * * Alterations must be reasonable, and, * * * they must not interfere with rights which have become vested under the operation of the original by-law or otherwise * *."
§ 188b. "* * * The power to alter, amend, or repeal by-laws may also be conferred on the * * * trustees, * * * but such authority, thus granted by by-law, does not authorize the directors to disregard or alter another by-law intended as a limitation upon their powers. * * *" (Emphasis added.) 18 C.J.S. Corporations § 188, pp. 600, 601.
As a membership association composed of and organized by osteopathic physicians for medical purposes, there are very few vested rights (unlike those which a stockholder may enjoy in a regular corporation) which the members enjoy by virtue of their membership in the Association. Certainly, one of the obvious rights which they retained for themselves under the *765 1955 bylaws was an ultimate control over the Board of Trustees on the question of who would be admitted to membership in the Association.[1] The very nature of the form of corporate organization and the purposes for which it was established made such control a matter of common sense.
It thus strikes us that the act of the Board of Trustees, depriving the membership at large of its long existing right of ultimate control over further admissions to the Association, coupled with their unilateral act of making themselves members, is patently unreasonable as a matter of law. It has deprived the membership of a right which when considered in the context of the corporate structure  a medical membership association  effectively deprives the members thereof from exercising some dominion over a Board of Trustees which for the most part is composed of laymen. For these laymen to seize for themselves certain vital powers which previously reposed in the members of the Association and to further place themselves in a position to perpetuate such acts, is an abuse far too apparent and unreasonable for us to permit them to stand.
For the reasons assigned the decision of the Chancellor is affirmed. The case is remanded to the Court of Chancery for further proceeding in conformance with the matters set forth herein.
NOTES
[1] We do not ignore the fact that this bylaw conflicts with the charter, as previously indicated. Up to the adoption of this resolution, however, the members and trustees accepted the by-law as controlling A compete reversal of that course of conduct with respect to such an important matter as this should not have been made without adequate notice and submission to the entire membership.