E. Y. CHAPIN, III, Applicant,

v.

BENWOOD FOUNDATION, INC., a Delaware corporation, S. L. Probasco, Jr., Walter R. Randolph, Jr., Sebert Brewer, Jr., Joseph H. Davenport, Jr., Robert Pegram Harrison, Sam I. Yarnell, J. Ralston Wells, John P. Wright, the Coca-Cola Company, a Delaware corporation, and American National Bank and Trust Company of Chattanooga, a national banking association, Respondents.

Court of Chancery of Delaware, New Castle.

Submitted May 14, 1979.

Decided June 5, 1979.

Michael D. Goldman, of Potter, Anderson & Corroon, Wilmington, for applicant E. Y. Chapin, III and respondents Benwood Foundation, S. L. Probasco, Jr., Walter R. Randolph and Joseph H. Davenport.

Martin P. Tully, of Morris, Nichols, Arsht & Tunnell, Wilmington, for respondent The Coca-Cola Co.

William Prickett and David B. Ripsom of Prickett, Ward, Burt & Sanders, Wilmington, for amicus curiae, Robert Pegram Harrison.

BROWN, Vice Chancellor.

The question presented in this case is whether the board of trustees of a Delaware nonprofit, charitable corporation can bind itself by the written agreement of its individual trustees to limit the composition of the board to a number of trustees less than that authorized by the certificate of incorporation and, also, whether by the same agreement it can legally bind itself in advance to name designated persons to fill vacancies on the board of trustees as such vacancies occur. The facts applicable to a determination of this question are as follows.

Benwood Foundation, Inc. (hereafter "Benwood") is a Delaware charitable corporation. It was formed in 1944 by George Thomas Hunter, of Chattanooga, Tennessee. The corporation has no capital stock and it is not conducted for profit. It is governed by a board of trustees which, pursuant to the certificate of incorporation, shall "not be less than three nor more than five in number." The certificate of incorporation further provides that the members of the corporation shall be the persons from time-to-time serving as its trustees. Thus, election or appointment of a person as trustee is likewise an admission of that person to membership in the corporation.

Benwood's certificate of incorporation states that the "exclusive objects or purposes to be promoted or carried on by this corporation are strictly religious, charitable, scientific, literary and educational activities as will promote the advancement or well-being of mankind." Its bylaws provide that it shall have broad powers to promote education by gifts to universities, colleges and schools; to establish and assist charitable hospitals; to aid the aged, infirm and diseased poor people; to assist religious instruction and worship; to promote science and literature; and to make awards and grant scholarships all for the benefit of "the Chattanooga, Tennessee area and elsewhere within the United States." The bylaws further provide as follows:

"Section 1. The powers of the corporation shall be vested in and exercised by a board of trustees not less than three nor more than five in number, which shall be composed, upon the organization of the corporation, of the incorporators thereof, and thereafter, of the persons named by them, or by the survivor or survivors of them, as their successors. The board of trustees may at any time elect other trustees to the board, provided that the total number shall not exceed the maximum herein provided for.

"Section 2. Any vacancy in the board of trustees however arising shall be filled by the vote of the remaining trustee or trustees, at any regular meeting of the board, or at any special meeting of the board called for the purpose."

From its formation in 1944 through 1975 the assets of Benwood were composed almost entirely of the common stock of three companies of which George Thomas Hunter, Benwood's founder, had been the controlling stockholder and chief executive. These companies were Coca-Cola Bottling Co. (Thomas), Inc., Coca-Cola Bottling Works (Thomas), Inc., and Coca-Cola Bottling Works, 3rd, all Delaware corporations. They are hereafter collectively referred to as the "Thomas Companies." During his lifetime Hunter gave Benwood a portion of the common stock of the Thomas Companies and, at his death in 1950, he bequeathed to Benwood all his remaining shares in the Thomas Companies.

Benwood was originally formed with three trustees. They were S. L. Probasco, E. Y. Chapin, Jr., and Sebert Brewer. In 1946 these three trustees increased the board to four and elected DeSales Harrison as the fourth trustee. Needless to say, this was all accomplished with Hunter's approval, and for a reason. Harrison and Brewer were the top executives, next to Hunter, of the Thomas Companies. Probasco and Chapin were chief executives of the American National Bank and Trust Company of Chattanooga (hereafter "the Bank") of which Hunter was a director for several decades until the time of his death, and with which he and the Thomas Companies had a close relationship. Hunter selected two execu-

tives from the Bank and two executives from the Thomas Companies so that after his death the two trustees from the Bank could not improvidently dispose of the stock of the Thomas Companies (which was, over the years, an excellent investment for Benwood, enabling it to disburse millions of dollars to charity and education annually) without the assent of the trustees from the Thomas Companies who might be better able to judge the value and continued potential of the Thomas Companies. At the same time, the two trustees from the Bank were placed in a position to watch over the administration of the Thomas Companies and to guard against excessive salaries, waste or other forms of mismanagement.

At the time of Benwood's formation and during the years thereafter, the stock of the Thomas Companies was of considerable value for the following reason. By virtue of a contractual arrangement with The Coca-Cola Company (which is named as a respondent in this action) the Thomas Companies owned the exclusive rights to the bottling of the beverage, Coca-Cola, in a large portion of the United States. These bottling rights were very valuable. Shortly after the acquisition of such rights, the Thomas Companies (which were known as "parent bottlers" in the industry) and other parent bottlers having similar rights as to other parts of the country, farmed out the bottling rights to actual bottlers in various subterritories, receiving in return a fixed profit per gallon from the sale of syrup to their bottlers. Subsequent to an unsuccessful effort in or about 1918 virtually to do away with the rights of the parent bottlers, The Coca-Cola Company from time-to-time made offers or attempts to acquire the parent bottlers and thus merge their rights into itself. By the time of Hunter's death, it had acquired all of them except the Thomas Companies.

Following Hunter's death, the original four trustees became concerned about the balance between them being upset by the death of one of their number. As a result, in 1952, they entered into a written agreement between themselves, the purpose of which was to provide in advance for the designation of the person who would succeed each of them as trustee in the event that their respective office should become vacant because of death or otherwise. In effect, each original trustee picked the person he wished to have succeed him and the other three, in return for a like consideration as to their choice of a successor, agreed to fill the vacancy with the person selected. By way of example, in the first of these so-called succession agreements, S. L. Probasco was to be succeeded by S. L. Probasco, Jr.; E. Y. Chapin, Jr. was to be succeeded by E. Y. Chapin, III; DeSales Harrison was to be succeeded by the person then serving as president of one of the Thomas Companies; and Sebert Brewer was to be succeeded by the person who would then be vice president and treasurer of the same company.

Similar succession agreements were executed in 1959, 1961 and 1966. Over the years, as three of the original trusteeships became vacant, they were filled by the persons designated as successor trustees in the several agreements. In 1962, S. L. Probasco, Jr. was elected to succeed his deceased father. In 1973, Walter J. Randolph, Jr. was elected to succeed the deceased DeSales Harrison. In 1975 E. Y. Chapin, Jr. resigned and his son, E. Y. Chapin, III was elected to replace him. Fittingly, however, each successor trustee was elected by resolution of the remaining members of the board at a meeting of the board. There was no reference to any agreement nor to any obligation to elect a successor because of any existing agreement.

The last succession agreement executed by the board of trustees of Benwood came about in 1972. It is this agreement which is under review in this action. It will be referred to hereafter as the 1972 Succession Agreement. In addition to naming successors, this agreement contained the following provision:

"1. The number of trustees in office shall at all times be four, no more and no less, and when a vacancy in such office occurs, no business other than the filling

of such vacancies shall take place until such vacancy is filled in accordance with this agreement."

This 1972 Succession Agreement also provided for Walter R. Randolph, Jr. to succeed DeSales Harrison, and provided further that if Randolph became a trustee, his office thereafter, becoming vacant, would be filled by Robert Pegram Harrison. The agreement concluded with the following catch-all provisions:

"5. Should succession as hereinabove provided not be possible for any reason, then the remaining trustees shall fill the vacancy as follows:

"(a) If the vacancy is in one or more of the offices now held by E. Y. Chapin, Jr. or Scott L. Probasco, Jr., [representatives from the Bank] or their successors, by such persons as shall be nominated by the Executive Committee of American National Bank and Trust Company of Chattanooga, or its successor;

"(b) If the vacancy is in one or more of the offices now held by DeSales Harrison or Sebert Brewer [representing the Thomas Companies] or their successors, by such person as shall be the then highest ranking officer of Coca-Cola Bottling Co. (Thomas), Inc. . . . not already serving as a trustee of [Benwood]."

Subsequently, in 1974, all four Benwood trustees, both the two who were executives of the bank and the two who were officers of the Thomas Companies, determined that it would be wise to accept an offer of The Coca-Cola Company to acquire the Thomas Companies. Due to inflation, the cost of operation of the Thomas Companies had constantly increased. Yet, the Thomas Companies could not increase their fixed markups of 12½ cents per gallon of syrup. Moreover, there was antitrust litigation pending against the Thomas Companies and others, brought by the Federal Trade Commission. Consequently, an agreement was reached whereby The Coca-Cola Company acquired all the common stock of the Thomas Companies owned by Benwood. Under the form of acquisition used, the Thomas Companies were merged into newly formed

subsidiaries of The Coca-Cola Company, which subsidiaries, in turn, were later merged into The Coca-Cola Company. Payment of the purchase price was completed in 1976. This left Benwood without any stock or interest in the Thomas Companies or its former business activities. At the same time, Benwood was left with assets in no way connected with the former Thomas Companies enterprise which now total some $40 million.

Following the sale of the Thomas Companies, three of Benwood's four trustees, namely, E. Y. Chapin, III, Probasco, Jr., and Randolph (all of whom had been elected to the board after having been designated as successor trustees in one or more of the various succession agreements) began to question the wisdom and propriety of continuing the 1972 Succession Agreement. This was particularly true in light of the purpose of the various agreements to keep an even balance between the Bank and the companies whose stock formed the assets of the corporation. With the Thomas Companies gone, there was some feeling that to continue to honor an agreement whose purpose could no longer be achieved might constitute an abdication of their legal duties by the incumbent trustees. The three aforenamed trustees proposed that the 1972 Succession Agreement be formally rescinded. However, the fourth trustee, Sebert Brewer, a former officer of the Thomas Companies and the sole remaining original trustee, would have none of it.

Accordingly, as of November 9, 1976, Chapin, Probasco and Randolph executed a written agreement whereby, as a majority of Benwood's board, they purported to rescind the 1972 Succession Agreement. Sebert Brewer did not sign the document. He died some two months thereafter.

Following the death of Sebert Brewer, the three aforesaid trustees held meetings in January 1977 and in April 1977. In accordance with the charitable purposes of Benwood, and in order to comply with distribution requirements of federal law pertaining to private foundations, they approved the disbursement of substantial

grants to other charitable organizations. In so doing, they took the position that Paragraph 1 of the 1972 Succession Agreement, which purported to restrict the transaction of any business unless the board of trustees was four in number, was of no legal effect. Further, at the April meeting, the three incumbent trustees elected Sebert Brewer, Jr. and Joseph H. Davenport, Jr. as trustees of Benwood, thus bringing the total number of trustees to the maximum of five permitted by the certificate of incorporation. Since Davenport is a considerable shareholder in the Bank, it can now be argued that Benwood's board of trustees and membership is currently dominated by trustees having an affiliation with the Bank as opposed to the two trustees having their ties to the former Thomas Companies.

Because of the uncertainty as to the correct composition of the board of trustees and the powers possessed by it, this action was filed by Chapin pursuant to 8 *Del.C.* § 225.* Named as respondents are Benwood, the Bank, The Coca-Cola Company, the other four named trustees and those persons designated as potential successor trustees, or alternates, in the 1972 Succession Agreement. The Bank, The Coca-Cola Company and certain of the individuals have filed answers submitting themselves to the jurisdiction of the Court and taking no position as to the outcome. Chapin, as applicant, together with Benwood, Probasco, Randolph and Davenport, as respondents, have moved for summary judgment declaring that the present five-member board of Benwood is lawfully constituted and elected. By agreement of all concerned, respondent Robert Pegram Harrison was appointed *amicus curiae* to "represent the interest of those who are or may be opposed to the position of the applicant Chapin." This was deemed appropriate particularly in view of the fact that Robert Pegram Harrison is designated in the 1972 Succession Agreement as the person to suc-

ceed Randolph at such time as his office becomes vacant.

■ In opposing the application the *amicus* takes basically two positions. Because election to the position of trustee also constitutes membership in the nonstock corporation, and since the only members of the corporation are the trustees, the *amicus* suggests that the issue is controlled by the statutes and decisional law which recognize and enforce agreements among shareholders. See 8 *Del.C.* § 218; 8 *Del.C.* § 350; *Ringling v. Ringling Bros.-Barnum and Bailey Combined Shows, Inc.*, Del.Supr., 29 Del.Ch. 610, 53 A.2d 441 (1947). But this analogy carries a fatal flaw. Quite simply, both 8 *Del.C.* § 218 and 8 *Del.C.* § 350 deal with stockholders. Under § 218 shareholders can contract to place their shares into a voting trust, provided that there is technical compliance with the requirements of the statute. Under § 350, a majority of the shareholders of a close corporation can enter into an agreement which will permit them to conduct the business and affairs of the corporation and which will relieve the directors of any responsibility and liability for managerial acts or omissions. However, this statute only applies to a close corporation within the statutory definition which elects to be treated as such. 8 *Del.C.* §§ 341, 344.

Here there are no stockholders of Benwood. This clearly makes a difference. A stockholder has an ownership interest in his shares. To the extent that he contracts away the rights deriving from that interest, it is his prerogative to do so. Thus, where all of the stockholders enter into an agreement surrendering rights they would otherwise have in governing the affairs of the corporation, there can be no apparent injury to anyone else and consequently, in theory, there is no reason not to uphold the agreement. *Glazer v. Glazer*, 5th Cir., 374 F.2d 390 (1967); *Galler v. Galler*, 32 Ill.2d

* 8 *Del.C.* § 225 provides in pertinent part as follows:

"Upon application of any stockholder, or any member of a corporation without capital stock, the Court of Chancery may hear and determine the validity of any election of any director, member of the governing body, or officer of any corporation, and the right of any person to hold such office . . . .."

16, 203 N.E.2d 577 (1965); *Clark v. Dodge*, 269 N.Y. 410, 199 N.E. 641 (1936). As stated in *Clark v. Dodge, supra*, at 199 N.E. 642:

> "If the enforcement of a particular contract [among shareholders] damages nobody—not even, in any perceptible degree, the public—one sees no reason for holding it illegal . . . ."

Here, however, the members of Benwood have no ownership interests. They are the members of the corporation only because they are the trustees of the corporation. Their membership status is coincidental with their fiduciary obligation to manage the affairs of the corporation in keeping with its charitable purpose to benefit deserving members of the public in the Chattanooga, Tennessee area, and elsewhere. As such, they have no personal ownership rights which they can contract away. Rather, they have only their duty to the form of public trust which they have assumed, and the contractual attempt to relinquish that duty in return for the relinquishment of a similar duty by the other trustees does not constitute consideration for a contract as I see it.

Secondly, the *amicus* disputes the contention of the movants that the 1972 Succession Agreement constitutes an improper delegation of duty by persons who stand in the position of directors of a corporation. It is the position of the *amicus* that the succession agreement is not a delegation of a duty at all, but rather that under the circumstances it constitutes an express exercise of the duties of the trustees of Benwood since their mutual agreement in advance to fill vacancies occurring on the board by named persons who will maintain the equal balance between representatives of the Bank and those with allegiance to the Thomas Companies carries out the intentions of George Thomas Hunter to prevent either side from gaining control over the other in the management and charitable distribution of Benwood's assets. In other words, the *amicus* would find a duty on the part of Benwood's trustees to always maintain a balance on the board of trustees between the Bank and the Thomas Companies, and he would further use this duty as justification for the enforcement of the 1972 Succession Agreement. However, I think that this approach too must fail.

In the first place, Benwood's certificate of incorporation, from its inception, has always allowed for a board composed of either three or five trustees as well as a board composed of four trustees. The bylaws echo this, and leave the decision to the board. Thus, neither the certificate of incorporation nor the bylaws impose any duty upon the incumbent trustees to maintain a board equally divided between the Bank and the Thomas Companies. Secondly, as the pleadings concede, the basis for the original balanced board, and thus the reason for the birth of the succession agreement idea, was to protect the Thomas Companies from internal exploitation and waste after Hunter's death while at the same time to guarantee that the Thomas Companies could not be disposed of as a Benwood asset by the decision of persons who might not have full knowledge of the capabilities and prospects of the Thomas Companies at a given time. Thus, the purpose of the agreements was to protect the primary asset of Benwood. Since that asset has now been disposed of to the benefit of Benwood, the basis for the duty that the *amicus* would find in the trustees has vanished also. For these reasons, I cannot conclude that the 1972 Succession Agreement constituted the exercise of a duty imposed upon the board of trustees by Benwood's certificate of incorporation or bylaws.

On the contrary, I agree with the movants that the decision here should be controlled by the longstanding rule that directors of a Delaware corporation may not delegate to others those duties which lay at the heart of the management of the corporation. *Clarke Memorial College v. Monaghan Land Co.*, Del.Ch., 257 A.2d 234 (1969); *Lehrman v. Cohen*, Del.Supr., 43 Del.Ch. 222, 222 A.2d 800 (1966); *Abercrombie v. Davies*, Del.Ch., 35 Del.Ch. 599, 123 A.2d 893 (1956), *rev'd. on other grounds*, Del.Supr., 36 Del.Ch. 371, 130 A.2d 338

(1957); *Adams v. Clearance Corporation*, Del.Supr., 35 Del.Ch. 459, 121 A.2d 302 (1956); *Field v. Carlisle Corporation*, 31 Del.Ch. 227, 68 A.2d 817 (1949). While none of these cases are directly on point, and while none dealt with the duties of the trustees or directors of a nonstock corporation, the fundamental principle which permeates them all is perhaps best summed up by the statement of Chancellor Seitz in *Abercrombie v. Davies, supra*, at 123 A.2d 899:

> "So long as the corporate form is used as presently provided by our statutes this Court cannot give legal sanction to agreements which have the effect of removing from directors in a very substantial way their duty to use their own best judgment on management matters."

To the same effect, see *West v. Camden*, 135 U.S. 507, 10 S.Ct. 838, 34 L.Ed. 254 (1890); *Gilchrist v. Hatch*, Ind.App., 100 N.E. 473 (1913), *rev'd. on other grounds*, 183 Ind. 371, 106 N.E. 694 (1914); *Van Slyke v. Andrews*, 146 Minn. 316, 178 N.W. 959 (1920); *Dubbs v. Kramer*, 302 Pa. 455, 153 A. 733 (1931).

Here, Benwood's certificate of incorporation calls for a board of trustees of no less than three and no more than five. The trustees constitute the only members of a charitable organization having some $40 million in assets. The members and trustees cannot benefit from their position in the corporation. They are not stockholders in any sense. The persons having the beneficial interest in Benwood are those located in the Chattanooga, Tennessee area, as well as elsewhere, who will benefit from the periodic decisions of the board as to whom will receive disbursement of Benwood assets for the charitable purposes contemplated by the certificate of incorporation and the bylaws. The bylaws provide that the board of trustees may at any time elect other trustees so long as the number does not exceed five. The bylaws also provide that the board of trustees shall fill vacancies occurring thereon.

All things considered, I am convinced that the facts of this situation impose upon the trustees of Benwood a duty to use their best judgment in filling a vacancy on the board of trustees as of the time the need arises. To commit themselves in advance— perhaps years in advance—to fill a particular board vacancy with a certain named person, regardless of the circumstances that may exist at the time that the vacancy occurs, is not the type of agreement that this Court should enforce, particularly when it is an agreement made between persons who have no personal interest at stake but who owe a duty to those intended to be benefited by the charitable corporation they are charged with managing. For the same reason it is even more obvious that this Court should not enforce an agreement between the trustee-members of a charitable corporation which attempts to restrict the maximum number of trustees otherwise permitted by the certificate of incorporation and bylaws.

Accordingly, I conclude that the 1972 Succession Agreement is unenforceable as against the decision of Benwood's board of trustees in April 1977 to increase the number of trustees to five and to elect Sebert Brewer, Jr. and Joseph H. Davenport, Jr. to the board. In other words, I find the board of trustees properly constituted and the present five trustees the lawful holders of their respective offices. An appropriate form of order may be submitted.