# Presidential Appointment of the Board of Directors of Radio Free Europe/Radio Liberty, Inc.

Statute conditioning further funding of Radio Free Europe/Radio Liberty, Inc. on the President's selection of its Board of Directors would not undermine the public purposes of this nonprofit corporation, and it is therefore unlikely that the Delaware courts would strike it down under that state's laws.

August 31, 1982

## MEMORANDUM OPINION FOR THE CHAIRPERSON, BOARD FOR INTERNATIONAL BROADCASTING

This responds to your request of July 12, 1982, for our opinion whether Delaware law would prohibit a proposed amendment to the certificate of incorporation of Radio Free Europe/Radio Liberty, Inc. (RFE/RL) and confirms the oral advice I gave you on this subject in July. RFE/RL is a nonprofit company incorporated under Delaware law with a private Board of Directors. The Board for International Broadcasting Authorization Act for Fiscal Years 1982 and 1983, Pub. L. No. 97–241, 96 Stat. 273, 295 (1982), which was signed last week by the President, requires RFE/RL, if it is to receive any future federal funding, to amend its certificate of incorporation so that its Board of Directors would be selected by the President of the United States, with the advice and consent of the Senate. For the reasons set forth in detail below, we believe that it is unlikely that the Delaware courts would strike down such an amendment to RFE/RL's certificate of incorporation.

### I. Background

Although RFE/RL is a private corporation, it currently receives over 99 percent of its operating funds from congressional appropriations[1] and is subject to numerous federal restrictions on its operations as a condition for this funding. This unusual hybrid of private and public control is largely an historical artifact. Over 30 years ago the Office of Policy Coordination, and later the Central Intelligence Agency (CIA), established and secretly funded two separate, nonprofit corporations, Radio Free Europe and Radio Liberty, which were the

---

[1] According to your letter, its current budget request is for more than $95 million, although private contributions have never exceeded $200,000 per annum since 1975.

historical antecedents of RFE/RL.[2] In 1973, after Congress had by legislation directed that all connections between the CIA and the two corporations terminate, Congress created the Board for International Broadcasting (BIB) to oversee the funding and operation of these two radio stations. *See* Pub. L. No. 93–129, 87 Stat. 456 (1973), 22 U.S.C. §§ 2871–2879. Subsequently, Radio Free Europe and Radio Liberty merged to become RFE/RL, over which the BIB retained funding and oversight authority.

As provided in the 1973 Act, *as amended,* the BIB is composed of five members appointed by the President with the advice and consent of the Senate. The BIB has general authority to assure that RFE/RL is operated efficiently and consistently with the broad foreign policy objectives of the government. *See* 22 U.S.C. § 2873 (1981). Pursuant to this authority, the BIB has promulgated regulations which make RFE/RL "responsible for assuring compliance of its operations with the policy guidelines" established by the BIB and which provide for any remedial action the BIB determines is necessary because of violations of these guidelines. 22 C.F.R. § 1300.6(c)–(f). The Chairperson of the BIB may also veto any nomination made by the RFE/RL nominating committee for a position as an officer of RFE/RL, and, under the by-laws of RFE/RL, as a new director.[3] Finally, the regulations require that RFE/RL obtain the approval of the BIB before it amends its certificate of incorporation. *See* 22 C.F.R. § 1300.13(c).

These overlapping lines of authority have resulted in continuing disagreements between the BIB and the Board of Directors of RFE/RL over the goals and operation of RFE/RL. The Board of International Broadcasting Authorization Act for Fiscal Years 1982 and 1983 would resolve these conflicts by granting the BIB absolute authority over RFE/RL. Under § 403(a) of the Act, RFE/RL is required, as a condition for future funding from the BIB, to amend its certificate of incorporation so that the members of the BIB serve as RFE/RL's Board of Directors.[4] Since the Board of Directors of RFE/RL are also the members of RFE/RL, *see* RFE/RL, Inc., By-laws, § 2.1, this would give the BIB complete control of the corporation. Moreover, the Board of Directors of RFE/RL would be appointed by the President of the United States and would be removable by the President at his pleasure.

In response to this legislation, RFE/RL solicited an opinion from its Delaware counsel whether Delaware law would permit the continued incorporation of RFE/RL were this amendment to RFE/RL's certificate of incorporation to be adopted. You have provided us with a copy of that opinion. *See* Opinion of Potter,

---

[2] Radio Free Europe, Inc. was incorporated under New York law, while Radio Liberty Committee, Inc. was incorporated under Delaware law

[3] The regulations provide that the Chairperson shall serve as an ex officio member of the Board of Directors and as a voting member of the nominating committee for the nomination of officers. *See* 22 C F R. § 1300.9(b). Because all nominations must receive the unanimous consent of the members of the nominating committee before they may be presented to the Board of Directors, the Chairperson can veto any nomination for an officer's position in the corporation. The by-laws of RFE/RL also provide that the Chairperson of the BIB shall serve as a voting member of the nominating committee for all purposes, thereby permitting him to veto any nomination for director as well. *See* RFE/RL, Inc , By-laws, § 3.13.1(b)(i)

[4] The Act would also increase the number of BIB members to ten, nine of whom would be appointed by the President The tenth member, who would serve ex officio without voting rights, would be the chief executive officer of RFE/RL. *See* Pub. L. No. 97–241, 96 Stat. 273, 296 (1982).

Anderson and Carroon, dated May 28, 1982 (Delaware opinion). The Delaware opinion states that it is a "fundamental concept" of nonprofit corporation law that directors or members of nonprofit corporations may not delegate to outsiders those duties that lie at the heart of the management of the corporation. Since the selection of a corporation's directors is one of the most important decisions regarding the operation of the corporation, the Delaware opinion concludes that Delaware law does not permit the directors of a nonprofit corporation to be chosen by the "holder of an office," such as the President of the United States, "who is neither associated with nor interested in the operations of the corporation and whose decision[s] would be governed by considerations different from and potentially adverse to the best interests of the corporation." Delaware opinion at 5.

## II. Delegation of Corporate Decisions

The analysis in the Delaware opinion is based on the traditional doctrine restricting directors of for-profit corporations from delegating management decisions to outsiders. *See* Del. Code Ann. tit. 8, § 141(a)(1974). Under the Delaware opinion's reasoning, the Delaware courts would extend this doctrine to prohibit the directors of RFE/RL, a nonprofit corporation, from delegating the selection of new directors to the President of the United States. As the Delaware opinion recognizes, however, the organization of and laws governing nonprofit corporations are different from those governing for-profit corporations. The Delaware General Corporation law, which regulates nonprofit corporations as well as for-profit corporations, specifically states that the certificate of incorporation of a nonstock corporation "may . . . provide that the business and affairs of the corporation shall be managed in a manner different from that provided in this section." Del. Code Ann. tit. 8, § 141(j). The Delaware General Corporation law also provides that the certificate of incorporation of a nonstock corporation may alter the general rule that each member shall have one vote. Del. Code Ann. tit. 8, § 215. Thus, nonprofit corporations have greater latitude under Delaware law in their organizational structure than for-profit corporations, although the absence of relevant case law leaves unclear what limits the Delaware courts would ultimately place on the organization of nonprofit corporations in a particular context. Accordingly, in reviewing the proposed amendment, we will examine the underlying purpose of the restriction on managerial delegations and attempt to assess how the Delaware courts would apply this restriction to a nonprofit corporation like RFE/RL. We will then consider the relevance of the two cases relied on in the Delaware opinion.

### A. *Delegation of Managerial Decisions in a For-Profit Corporation*

The restriction on the delegation of managerial decisions is derived from Del. Code Ann. tit. 8, § 141(a), which states that "[t]he business and affairs of every corporation organized under this chapter shall be managed by a board of direc-

tors, except as may be otherwise provided in the other provisions in this chapter or in its certificate of incorporation." By providing that a separate group such as the directors manage the corporation, the section furthers two objectives. First, it assures that the business affairs of the corporation are not managed by the equity owners of the corporation. *See Abercrombie* v. *Davies,* 123 A.2d 893, 899 (Del. Ch. 1956), *rev'd on other grounds,* 130 A.2d 338 (Del. 1957).

Second, the provision assures that the group which manages the corporation, the directors, is nevertheless responsible and accountable to the stockholders. This would not be true if an outsider were delegated management duties. In this regard, the directors are the agents of the stockholders and owe a fiduciary duty to exercise their best judgment in coordinating the affairs of the corporation. *See generally* 2 W. Fletcher, Cyclopedia of the Law of Private Corporations, §§ 295–296 (rev. perm. ed. 1982). If an outsider or a stockholder were to run the management affairs of the corporation, that person would be acting without the authority of the stockholders and therefore would necessarily be undermining the directors' "duty to use their own best judgment on management matters." *Abercrombie* v. *Davies,* 123 A.2d at 899. *See generally Clarke Memorial College* v. *Monaghan Land Co.,* 257 A.2d 234 (Del. 1969); *Lehrman* v. *Cohen,* 222 A.2d 800 (Del. 1966).

This section, however, does not require that directors make all corporate decisions. It obviously would not preclude the stockholders as a group from selecting the directors. The selection and removal of directors is not a management decision which must be made by the directors themselves, but a right normally vested in the equity owners of a corporation to choose the management. *See, e.g., Campbells* v. *Loew's,* 134 A.2d 852, 857 (Del. Ch. 1957). Similarly, this section would not prohibit stockholders from selling their stock to individuals who were previously outside the firm, or, subject to the requirements of Delaware's voting trust statute, delegating their choice of directors to outsiders while retaining their equity interest in the firm. *See* Del. Code Ann. tit. 8, § 218. *See generally Adams* v. *Clearance Corp.,* 121 A.2d 302 (Del. 1956); *Ringling Bros.* v. *Ringling,* 53 A.2d 441 (Del. 1947). Finally, under the modern view, § 141(a) would not prohibit the directors from delegating most management decisions to outsiders when specifically authorized by the stockholders in an amendment in the certificate of incorporation. *See Lehrman* v. *Cohen,* 222 A.2d at 808. In such a case, the principal (the stockholders) has expressly authorized the agent (the directors) to delegate his authority. *See* 2 W. Fletcher, Cyclopedia of the Law of Private Corporations, § 496 (rev. perm. ed. 1982).

## B. Delegation of Decisions in Nonprofit Corporations

Application of § 141(a) to a nonprofit corporation is complicated because the provision is intended largely to regulate the operation of a for-profit corporation comprised of equity stockholders and a separate board of directors. A nonprofit corporation such as RFE/RL, however, has no stockholders. It is managed *and* controlled by a self-perpetuating Board of Directors charged with furthering the

public goals in its certificate of incorporation. In light of these differences, we believe that the proposed amendment to RFE/RL's certificate of incorporation would not violate § 141(a) as that provision would be applied to nonprofit corporations.

First, it is important to recognize that the proposed amendment would not delegate a *management* decision from the directors of the corporation, but rather would delegate the selection of who may make the management decisions. At least with respect to for-profit corporations, however, § 141(a) is intended to limit only the delegation of management decisions, not the selection of management. Under the proposed amendment, the directors of RFE/RL still would have authority over the management of the business affairs of the corporation. They merely could be replaced if the President were dissatisfied with their decisions or performance, just as the directors of many for-profit corporations can be replaced by the stockholders. *See Everett* v. *Transnation Devel. Corp.*, 267 A.2d 627 (Del. Ch. 1970).[5]

Second, delegating the selection of directors to a person outside a nonprofit corporation raises different issues than directors delegating management decisions to outsiders in a for-profit corporation. A director is prohibited from delegating a management decision to an outsider largely because this would allow a person not selected by the stockholders, for whom the corporation is run, to manage its business affairs. In effect, it takes control of the corporation away from the stockholders. A nonprofit corporation, however, is operated to pursue the public objectives in its certificate of incorporation. Delegating the selection of directors to an outsider in a nonprofit corporation such as RFE/RL does not remove control of the corporation from the group in whose interest it is operated. Rather, in the case of RFE/RL, it merely transfers control from a self-perpetuating Board of Directors, each of whom also holds another institutional position, to a person who technically does not hold an institutional position in RFE/RL.

Finally, in the unusual facts of this case, placing control of RFE/RL in the hands of the President is as likely to protect the public goals of RFE/RL as selection by an internal self-perpetuating Board. For all practical purposes, the President is an insider for purposes of selecting the directors of RFE/RL. The President has prime responsibility for formulating the foreign policy of the United States and is specifically charged by statute with selecting directors of the BIB "distinguished in the fields of foreign policy or mass communications." *See* 22 U.S.C. § 2872(b)(2).[6] He is "chief executive officer" of the "organization" which supplies essentially all of RFE/RL's funds. Moreover, if the Delaware courts refused to uphold the change, RFE/RL might very well cease to exist, at least as incorporated in Delaware. Finally, the existing certificate of incorporation, which the Delaware opinion does not suggest violates Delaware law, already gives the President significant control over the operation of RFE/RL through the

---

[5] The distinction between management and the selection of management is inherent in § 141(a), at least in the context of for-profit corporations. *See Abercrombie* v. *Davies*, 123 A 2d at 899.

[6] Under the proposed amendment, no more than five members of the Board may be of the same political party.

regulations of the BIB, whose members he selects. Indeed, the BIB itself presently exercises, as pointed out above, veto power over the selection of the membership of the Board of Directors, a power that the Delaware opinion does not suggest to be inconsistent with Delaware corporation law.

In addition, we note that nonprofit corporations incorporated in other states have directors chosen by public officials. Many state-related universities in the Commonwealth of Pennsylvania, which are incorporated under its nonprofit corporation law, have a percentage of their trustees selected by the governor pursuant to state law.[7] Similarly, members of the Board of Directors of the National Science Foundation, incorporated under federal law,[8] are chosen by the President. Thus, selection of the directors by an elected official does not necessarily, or in our view, even presumptively, undermine the public purposes of a nonprofit organization.

Of course, it can be argued that the President may not be as sensitive to the journalistic independence of RFE/RL as would be the private Board. Whatever policy arguments might be made in favor of an autonomous board, we doubt that the Delaware courts would hold this independence to be a requirement for RFE/RL to retain its corporate status under Delaware law. Not only are there many advantages to presidential selection, as described above, but selection by the existing Board does not assure to any greater degree that the public goals of the corporation will be faithfully pursued. Unlike equity stockholders in a for-profit corporation, the directors of a nonprofit corporation have no financial incentive to make decisions to further the stated goals of the corporation. As the Senate report on the Board for International Broadcasting Authorization Act for Fiscal Years 1982 and 1983 observes of RFE/RL's Board, it is a "self-appointed, largely self-perpetuating board of private directors." S. Rep. No. 71, 97th Cong., 1st Sess. 31 (1981). For all of these reasons, we believe that transferring authority over selection of directors from the members to the President does not undermine the public goals of RFE/RL, and therefore that it is unlikely that the Delaware courts would find that it violates § 141(a).

### III. Case Law

Finally, we note that the two cases relied on by the Delaware opinion for its conclusion are clearly distinguishable because in both cases the delegation raised a substantial possibility that the public goals of the nonprofit corporation would be undermined.

The first case, *In re Osteopathic Hospital Association of Delaware*, 191 A.2d 333 (Del. Ch.), *aff'd*, 195 A.2d 759 (Del. 1963), dealt with an unusual nonprofit corporation—the Osteopathic Hospital Association of Delaware. The association's by-laws allowed only osteopathic physicians to be general members of the

---

[7] *See Mooney* v. *Temple University*, 292 A.2d 395, 399–400 (Pa 1972) (describing selection of university trustees by Governor)

[8] *See* National Science Foundation Act of 1950, Pub. L No. 81–507, § 4, 64 Stat. 149, 150, as amended, 42 U S C. § 1863.

517

Association, although the members could elect laypersons to serve on the Board of Trustees. As it turned out, a majority of the Board was made up of laypersons. Because the Board had authority to amend the by-laws, it voted to make all the trustees members of the Association. The chancery court struck down the amendment on the ground that "a change of so fundamental a character in the structure of this rather unique organization could not validly be carried into effect by the unilateral action of the trustees taken here," but rather must be achieved by submitting the issue to the members as an amendment to the certificate of incorporation. *See* 191 A.2d at 336. The Supreme Court of Delaware subsequently affirmed for the same reasons. *See* 195 A.2d 759.

*In re Osteopathic Hospital Association* is distinguishable on two grounds. First, the chancery court only held that a fundamental change such as this must be achieved through an amendment to the certificate of incorporation ratified by the members. *See* 191 A.2d at 338. The court did not hold that the members could not give lay trustees the authority to make decisions on membership.[9] Had the members specifically amended the certificate of incorporation to allow the trustees to make this decision, as the members of RFE/RL would amend its certificate of incorporation to permit presidential selection, the amendment would, we believe, have been upheld under the court's analysis.

Second, the chancery court specifically relied on the fact that the delegation presented a "real" "possibility of abuse." 191 A.2d at 336. Because the Osteopathic Hospital Association was a professional association, there was a divergence of interests between the lay board and the professional osteopathic members. Thus, the amendment "seriously impaired a valuable right of these [association] members under circumstances suggesting opposition by at least a majority of such 'members.'" *Id.* at 338. In contrast, RFE/RL does not serve any private membership interests which would be seriously undermined by presidential selection. It is specifically charged with "engag[ing] in independent, professionally competent, responsible broadcast journalism, and shall thereby promote the right of freedom of opinion and expression . . . ." RFE/RL, Inc., Articles of Incorporation at 2. The President stands in a far different position from the potentially self-serving lay board in *In re Osteopathic Hospital Association*.

The second decision on which the Delaware opinion relies, *Chapin v. Benwood Foundation, Inc.,* 402 A.2d 1205 (Del. Ch. 1979), *aff'd sub. nom. Harrison v. Chapin,* 415 A.2d 1068 (Del. 1980) (per curiam), involved a challenge to a voting agreement among the trustees of the Benwood Foundation. Two of the four members of the Board of Trustees of Benwood were officers of the Thomas Corporation. The stock of the Thomas Corporation was the sole asset of the Foundation. The two other Board members were directors of a Tennessee bank with which the Thomas Corporation had close dealings. The trustees entered into an agreement whereby each trustee would select his own successor, or, in the event he should fail to name a successor, the directors of the institution

---

[9] In affirming the chancery court, the Supreme Court of Delaware found that the members had "retained for themselves under the 1955 by-laws . . . ultimate control over the Board of Trustees on the question of who would be admitted into the Association." 195 A.2d at 764–65 (footnote omitted).

518

with which he was associated would pick his successor. The arrangement was intended to maintain a balance between the officers of the company, who would be most knowledgeable regarding the value of the Foundation's only asset, and the bank directors, who would possess an independent perspective on its financial affairs. The arrangement continued in operation through several changes in the Board. After the Thomas stock was sold, however, three of the trustees agreed to abolish the procedure because the original rationale supporting it had ceased to exist. The agreement was subsequently challenged in court.

The chancery court struck down the agreement on the ground that it constituted an improper delegation of the duties of trustees. It gave two reasons in support of the decision. First, the justification for this delegation—to keep an even split of the institutional backgrounds of the trustees on the Board—had ended, and therefore there was no continued need for the arrangement. Second, the ratification of this plan by all of the trustees (who were also the "members" of the Benwood Corporation) did not render the agreement valid. Because the trustees were not stockholders with an equity interest in the corporation, the court reasoned that they could not sanction this fundamental change in the operation of the corporation.

It is *possible* to interpret certain language in the opinion of the chancery court in *Chapin* as prohibiting any delegation of corporate responsibility by a nonprofit corporation. We believe, however, that the decision should be limited to its facts—that is, a situation in which there is no indication that the delegation would serve the public goals of the nonprofit corporation.[10] In this regard, we note that the Supreme Court of Delaware affirmed the chancery court solely on the ground that there was no longer any justification for the agreement, and expressly refused to reach "the other matters argued by counsel." 415 A.2d at 1069.

## IV. Conclusion

We believe that there is no absolute prohibition against members of nonprofit corporations delegating decisions to individuals who do not hold office within the firm. While there may be restrictions on such delegation in individual cases, the delegation proposed in this case would be as likely to protect the public goals of RFE/RL as selection by a self-perpetuating Board of Directors. Finally, the cases relied on in the Delaware opinion are distinguishable. Accordingly, in our view, it is unlikely that the Delaware courts would strike down the proposed amendment.

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[10] In its conclusion, the chancery court emphasized that the directors' agreement could lead to abuse. "To commit themselves in advance—perhaps years in advance—to fill a particular Board vacancy with a certain named person regardless of the circumstances that may exist at the time that the vacancy occurs, is not the type of agreement that this court should enforce . . ." 402 A.2d at 1211.