# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WEST PALM BEACH FIREFIGHTERS' PENSION FUND, on behalf of itself and all other similarly-situated Class A stockholders of MOELIS & COMPANY, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2023-0309-JTL |
| MOELIS & COMPANY, | ) ) | |
| Defendant. | ) ) | |

## OPINION ADDRESSING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF LACHES AND RIPENESS

Date Submitted: October 18, 2023
Date Decided: February 12, 2024

Thomas Curry, Taylor D. Bolton, SAXENA WHITE P.A, Wilmington, Delaware; David Wales, SAXENA WHITE P.A White Plains, New York; Adam Warden, SAXENA WHITE P.A; Boca Raton, Florida; *Counsel for Plaintiff.*

John P. DiTomo, Miranda N. Gilbert, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; William Savitt, Anitha Reddy, Getzel Berger, Emma S. Stein, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Counsel for Defendant.*

**LASTER, V.C.**

Section 141(a) of the Delaware General Corporation Law (the "DGCL") famously states that "the business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation."[1] Governance arrangements that do not appear in the charter and deprive boards of a significant portion of their authority contravene Section 141(a). An extensive body of Delaware precedent has considered Section 141(a) challenges to governance arrangements. Over a dozen decisions have invalidated governance arrangements that violated Section 141(a).

The plaintiff challenges a stockholders agreement between Moelis & Company (the "Company") and three entities controlled by Ken Moelis, the Company's CEO, Chairman, and eponymous founder. In 2014, Moelis caused the Company to issue shares to the public. Shortly before its shares began to trade, Moelis and the Company entered into a stockholders agreement containing an array of provisions that grant Moelis expansive rights (the "Challenged Provisions").

The plaintiff contends that the Challenged Provisions violate Section 141(a).[2] Whether that is so raises significant doctrinal issues, but neither those issues nor the details of the Challenged Provisions are relevant to this decision. This decision only

---

[1] 8 *Del. C.* § 141(a).

[2] Technically, one aspect of the plaintiff's challenge invokes Section141(c)(2). For simplicity, this decision refers only to Section 141(a). The analysis is the same.

addresses the Company's arguments that the plaintiff's claims are non-justiciable because the plaintiff both sued too late and too early.

When ruling on a justiciability issue, a court assumes that the underlying claim is valid. Justiciability issues concern whether a particular court should hear the particular claim brought by a particular plaintiff at a particular time. A defendant might argue that a particular plaintiff is not the right person to bring the claim (standing), that the court lacks or should not exercise its power to hear the claim (jurisdiction), that the claim was filed at the wrong time (timeliness or ripeness), or that a dispute no longer exists (mootness).

The Company says the plaintiff waited too long because more than three years have passed since its IPO, when the stockholders agreement was first disclosed. Plus, more than three years have passed since the plaintiff acquired his shares, shortly after the IPO.

Neither argument prohibits a facial challenge to the legality of the Challenged Provisions. If the plaintiff is correct, and the court must assume so when conducting a timeliness analysis, then the Challenged Provisions are void. An equitable defense like laches cannot validate a void act, so the argument that the plaintiff sued to late fails because of the nature of the claim.

Assuming laches could apply, the plaintiff did not wait too long to sue. The illegality of the Challenged Provisions is not a discrete event that occurred and become complete when Moelis and the Company executed the stockholders agreement in 2014. The illegality began then and has persisted ever since. The

2

wrongful conduct is ongoing. At a minimum, the plaintiff can attack the Challenged Provisions' current illegality.

As part of its laches argument, the Company stresses that the stockholders agreement was disclosed in connection with the IPO, seemingly arguing for some species of acquiescence. Acquiescence cannot validate a void act either. Nor does a stockholder concede the legality of everything that a company has disclosed through the act of buying stock. A stockholder can rely on the law for protection against illegality.

The Company next argues that the plaintiff sued too early. According to the Company, the plaintiff must wait for Moelis or the directors to breach their fiduciary duties, then assert an equitable challenge. But corporate action is twice-tested, once at law and again in equity. The two challenges are separate and distinct, so the potential availability of one claim does not defeat another. The plaintiff could wait and bring an equitable, as-applied challenge in the future based on how Moelis wields the Challenged Provisions in a particular setting and how the Board responds. But the plaintiff can also bring a facial challenge to the legality of the Challenged Provisions now. The Company might want the plaintiff to wait, but the plaintiff is the master of the complaint. The facial challenge is ripe.

The Company's motion for summary judgment on the basis of laches and ripeness is denied. At an appropriate time, judgment will be entered in favor of the plaintiff on those defenses.[3]

## I. FACTUAL BACKGROUND

The pertinent facts are undisputed.[4] In 2007, Moelis formed a new boutique investment bank. He has run the business ever since as CEO and Chairman. The bank enjoyed immediate success and expanded globally. By 2013, it was generating over $400 million in annual revenue.

In 2014, Moelis decided to raise capital by selling shares to the public. He created the Company to effectuate the IPO.

The IPO prospectus disclosed that Moelis and the Company would enter into a stockholders agreement. One day before the Company's shares began trading, the Company and three of Moelis's controlled affiliates executed it (the "Stockholders Agreement"). That agreement contains the Challenged Provisions.

The plaintiff purchased shares of the Company's Class A common stock on November 19, 2014. He filed this action on March 13, 2023. The plaintiff contends

---

[3] The parties have filed cross-motions for summary judgment on the facial invalidity of the Challenged Provisions. The court will issue a separate decision addressing those motions. The court will not enter an order implementing this decision until after the merits decision has been issued. The time for any motion for reconsideration, any application for interlocutory appeal, or any similar relief will run from the date of the implementing order.

[4] Citations in the form "PX __" refer to exhibits that the plaintiff submitted with its opening brief or reply brief. Citations in the form "DX__" refer to exhibits that the Company submitted with its opening brief and reply brief. Citations in the form "Tr.__" are to the transcript of the oral argument. Dkt. 30.

that the Challenged Provisions are invalid and unenforceable. The Company answered the complaint, and the parties filed cross-motions for summary judgment.

## II.     LEGAL ANALYSIS

Under Court of Chancery Rule 56, summary judgment "shall be rendered forthwith" if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." The facts are undisputed.

Counter-intuitive though it might seem, the Company argues simultaneously that the plaintiff both sued too late and too early. The Company argues that any facial attack on the Challenged Provisions comes too late. The Company argues that any as-applied attack comes too early. Neither argument warrants summary judgment in the Company's favor.

### A.     Laches

"When asserting a timeliness defense, a defendant argues that even if the claims are viable, the plaintiff cannot assert them, so the court effectively assumes the validity of the claims, then applies timeliness principles."[5] By contending that the plaintiff's claim is untimely, the Company maintains that even if the Challenged Provisions facially violate Section 141, the plaintiff waited too long to sue.

---

[5] *Lebanon Cty. Empls.' Ret. Fund v. Collis*, 287 A.3d 1160, 1193 (Del. Ch. 2022).

5

There are two conceptual frameworks for analyzing timeliness: the statute of limitations and the doctrine of laches.[6] Depending on the nature of the claim and the relief requested, a court of equity may apply either doctrine.

When a plaintiff has advanced a legal claim and seeks relief that would be available from a court at law, then the court will apply the statute of limitations in the same manner as a law court.[7] If a plaintiff has advanced an equitable claim or sought equitable relief, then the court will apply the doctrine of laches.[8] "Laches is an affirmative defense that the plaintiff unreasonably delayed in bringing suit after learning of an infringement of his or her rights."[9] It consists of two elements: "(i) unreasonable delay in bringing a claim by a plaintiff with knowledge thereof, and (ii) resulting prejudice to the defendant."[10]

Here, the request to invalidate the Challenged Provisions seeks equitable relief. That makes laches the pertinent doctrine.

There are three reasons why laches does not apply. The first is that an equitable defense like laches cannot validate a void act. The second is the absence of any unreasonable delay since the claim accrued. The third is the absence of prejudice.

---

[6] *See Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 7 (Del. 2009).

[7] *Perkins v. Cartmell*, 1845 WL 493 at *5 (Del. June 1845).

[8] 2 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 15.07[d] at 15-88 (2d ed. 2021).

[9] *Levey v. Brownstone Asset Mgmt., L.P.*, 76 A.3d 764, 769 (Del. 2013).

[10] *Id.*

6

### 1.   Equitable Defenses and Void Acts

If the Challenged Provisions violate Section 141(a), then they are void.[11] Equitable defenses, including laches, cannot validate void acts.[12] When a defendant invokes laches to defeat a claim of statutory invalidity, a trial court can properly strike it.[13] Given the theory of the complaint, laches is not an available defense.

### 2.   Unreasonable Delay Since The Claim Accrued

Assuming laches could apply, the plaintiff must have delayed unreasonably before bringing the claim. Determining whether a plaintiff delayed unreasonably requires determining when the claim accrued. A plaintiff cannot sue before a claim accrues, so the period of unreasonable delay cannot begin before that point.[14] Delaware decisions use three methods to determine when a claim accrues: the

---

[11] *See XRI Inv. Hldgs. LLC v. Holifield*, 283 A.3d 581, 651 (Del. Ch. Sept. 19, 2022) ("[T]he Delaware Supreme Court has stated that 'contracts that offend public policy or harm the public are deemed void,' . . . and the Delaware Superior Court has summarized the applicable principles as follows: 'As a general rule, agreements against public policy are illegal and void. . . . [P]ublic policy may be determined from consideration of the federal and state constitutions, the laws, the decisions of the courts, and the course of administration.'") (quoting *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1067 (Del. 2011) and *Sann v. Renal Care Ctrs. Corp.*, 1995 WL 161458, at *5 (Del. Super. Mar. 28, 1995)), *aff'd in part, rev'd in other part*, 304 A.3d 896 (Del. 2023).

[12] *XRI*, 283 A.3d at 641–42; *Absalom Absalom Tr. v. Saint Gervais LLC*, 2019 WL 2655787, at *3 (Del. Ch. June 27, 2019)); *see STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1137 (Del. 1991); *Waggoner v. Laster*, 581 A.2d 1127, 1137 (Del. 1990). Sections 204 and 205 of the DGCL "provide mechanisms for a corporation to unilaterally ratify defective corporate acts or seek relief from the Court of Chancery to validate any corporate act under certain circumstances." *Holifield v. XRI Inv. Hldgs. LLC*, 304 A.3d 896, 931 (Del. 2023). Those statutes can be used to validate void acts; equitable defenses still cannot.

[13] *Wilm. Tr., Nat'l Ass'n v. Sun Life Assurance Co. of Canada*, 294 A.3d 1062, 1072 (Del. 2023).

[14] *Collis*, 287 A.3d at 1195.

7

discrete act method, the continuing wrong method, and the separate accrual method.[15]

The discrete act method applies when a claim arises at a distinct point in time and is effectively complete as of that date, even if it has ongoing effects or implications. To apply the doctrine of laches using the discrete act method, "the court starts from when [the act occurred], counts forward to determine when the limitations period would end, and checks whether the plaintiff filed suit within the limitations period."[16] The statute of limitations can be extended by tolling doctrines, "but once a plaintiff is on inquiry notice, tolling stops, and the plaintiff must sue within a reasonable time or the claim will be barred."[17]

The continuing wrong method applies when the conduct giving rise to the claim persists over time. The wrongful act "is not complete, and the limitations period does not begin to run, until the continuing wrong ceases."[18] The doctrine of laches rarely applies, because "[i]f any portion of the wrongful act occurs within the limitations period, then the plaintiff can seek to impose liability and recover damages for the entire period covered by the continuing wrong."[19] Tolling periods and inquiry notice

---

[15] *Id.* at 1178.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

are therefore "irrelevant if the plaintiff sues while the conduct is ongoing or if a portion of the conduct occurred within the limitations period, because the plaintiff can sue for the continuing wrong as a whole."[20] But once the continuing wrong has stopped, tolling and inquiry notice can come into play if the plaintiff does not file suit until after the limitations period ends.[21]

Like the continuing wrong method, the separate accrual method applies when the conduct giving rise to the claim continues for a period of time. But under the separate accrual method, the conduct involves a series of interlinked, recurring acts, like photons in a beam of light or pearls on a string. Under the separate accrual method, laches can limit how far back the plaintiff can go to challenge wrongful conduct. To apply the doctrine, "the court determines when the plaintiff filed suit, looks back from that point over the length of the limitations period, and checks whether actionable conduct took place within that period."[22]

Under the separate accrual method, tolling and inquiry notice work in two ways. As with the continuing wrong method, "if the conduct has ceased and the limitations period otherwise would have run, then tolling doctrines can render the suit timely."[23] As with the discrete act method, "tolling doctrines can extend the

---

[20] *Id.*

[21] *Id.* at 1178–79.

[22] *Id.* at 1179.

[23] *Id.*

9

actionable period, enabling the plaintiff to recover over a longer time frame."[24]

Inquiry notice can cut off the extension of the actionable period, "but because the ongoing conduct is treated as a series of separate wrongs, inquiry notice does not cut off the plaintiff's ability to sue for conduct that took place within the portion of the actionable period that is unaffected by tolling doctrines."[25]

> When choosing an accrual method, a court considers various policy interests.
>
> On one side of the ledger are considerations associated with finality, including the advantages that repose has for the certainty of legal relationships, the savings of judicial and litigant resources that result from avoiding litigation over stale claims, and the improved reliability of results when evidence is fresh. On the other side of the ledger are considerations associated with access to justice, including the importance of providing plaintiffs with a fair opportunity to present their claims and the savings of judicial and litigant resources that result from avoiding premature lawsuits on issues that may never ripen into meaningful disputes. For Delaware corporate law, an additional policy consideration is our reliance on private litigants to enforce legal norms and provide fiduciary accountability.[26]

Different types of claims warrant different methods.

The plaintiff asserts a claim based on an ongoing statutory violation. The plaintiff does not argue that the invalid act happened when the Stockholders Agreement was executed and became complete at that point. The plaintiff contends that the on-going existence of the Challenged Provisions violates Section 141(a).

---

[24] *Id.*

[25] *Id.*

[26] *Id.* at 1201 (footnotes omitted).

10

Every moment that the Company's board operates under the constraints of the Challenged Provisions interferes with the directors' authority.

For an ongoing statutory violation, the policy interests support using either the continuing wrong method or the separate accrual method. Considerations associated with finality and repose are weak, because the claim concerns whether an ongoing arrangement contravenes limits that the General Assembly has imposed. Instead of the principal of finality yielding benefits, the principal of finality threatens to insulate illegality from review.

Concerns about stale claims and lost evidence also do not apply. The parties agree there are no facts in dispute. The key comparison is between the arrangement and the statute. There is no need for discovery into the details surrounding the arrangement's adoption or application. Concerns about lost evidence, faulty memories, or changing stories lack force. The desire to promote more accurate results by forcing plaintiffs to sue while the evidence is fresh does not apply either. Again, the facts are undisputed.

By contrast, the policy interest in providing plaintiffs with a fair opportunity to present their claims is strong. Delaware corporate law relies on private litigants to enforce legal norms and provide fiduciary accountability.[27] Stockholders are

---

[27] *See In re Dell Techs. Inc. Class V S'holders Litig.*, 300 A.3d 679, 686 (Del. Ch. 2023) ("Delaware's response recognizes that our entity law depends on private litigation for enforcement.").

11

rationally apathetic and therefore passive.[28] Stockholders and their advocates may not identify a statutory violation until something calls it to their attention.[29] Here, the catalyst may have been a law review article in 2021.[30] Delaware's reliance on private litigants to enforce its laws suggests the need for a more flexible accrual system, at least where statutory violations are concerned.

"When the wrongdoing is ongoing, cutting off the accountability mechanism allows the wrongdoing to continue. Delaware should not be in the business of facilitating ongoing wrongdoing," suggesting that the discrete act approach should not be the law for a Section 141(a) claim.[31] Under the discrete act approach, the mere passage of time would enable unlawful conduct to become lawful. Even if a Delaware corporation implemented a governance arrangement that directly violated the most fundamental principles of the DGCL, then as long as the arrangement managed to evade stockholder challenge for three years, the corporation could operate illegally in

---

[28] *See id.* ("Entrepreneurial plaintiff's counsel therefore perform a valuable service by pursuing litigation in a world where stockholders are rationally apathetic."); *Jana Master Fund, Ltd. v. CNET Networks, Inc.*, 954 A.2d 335, 340 (Del. Ch. 2008) ("Shareholders . . . are generally passive and may exercise their rights usually once a year by voting at the corporation's annual meeting. Yet, even with only this single task, most shareholders are rationally apathetic, the prevailing wisdom explains.").

[29] *See Collis*, 287 A.3d at 1201, 1203–05 (considering implications of system of private enforcement for selection of accrual method); *Bird v. Lida, Inc.*, 681 A.2d 399, 402–03 (Del. Ch. 1996) (Allen, C.) (discussing system of private enforcement).

[30] *See* Gabriel Rauterberg, *The Separation of Voting and Control: The Role of Contract in Corporate Governance*, 38 Yale J. Reg. 1124, 1172–73 (2021) (discussing the Moelis stockholders agreement).

[31] *Collis*, 287 A.3d at 1204.

perpetuity. The DGCL contains a number of mandatory provisions which, under the discrete act approach, could not be enforced after three years if a corporation managed to avoid suit for that long.

Take Section 220. Imagine a Delaware corporation included a provision in its charter or bylaws that purported to bar stockholders from inspecting books and records in the manner provided for by Section 220. The Delaware courts have held that even a charter provision cannot eliminate Section 220 rights.[32] Yet according to the Company, if the arrangement were disclosed and went unchallenged for three years, then stockholders would be powerless to claim that it was facially invalid.

Or take Sections 211 and 231. A Delaware corporation could include a provision in its charter or bylaws purporting to only require stockholder meetings every five years (notwithstanding Section 211(c)) and purporting to do away with the requirement to appoint inspectors of election (notwithstanding Section 231(a)). If that arrangement was disclosed and avoided challenge for three years, its directors could serve five-year terms and count their own votes at quinquennial meetings, Stockholders would be powerless to challenge the arrangement as facially invalid.

Or take Section 102(b)(7), which authorizes exculpation subject to specified statutory limitations. A company might state in its certificate of incorporation that directors and officers will not owe monetary damages for any breach of fiduciary duty whatsoever. No one sues for three years. Under the Company's discrete act approach,

---

[32] *See State v. Penn-Beaver Oil Co.*, 143 A. 257, 260 (Del. 1926).

that exculpation provision has become part of the corporation's governance structure, and no one can bring a facial challenge.

We could continue to play this game, but as a final example, consider a hypothetical similar to this case. Assume a Delaware corporation entered into a stockholder agreement with its founder stating: "Our elected board of directors shall have a purely advisory role, while ultimate discretion to manage the business and affairs of the corporation remains with our founder." By the Company's logic, if no one challenged the provision within the first three years, then a facial challenge would be impossible. The purely advisory board would have become part of that company's corporate governance structure.

It might be tempting to pooh-pooh these examples because entrepreneurial plaintiffs' lawyers monitor public filings. With plaintiffs' lawyers on the job, how could any statutory violations slip through? But the enforcement efforts of plaintiffs' counsel are spotty. They focus on bigger issuers (the Willie Sutton effect), and understandably prioritize reliable legal theories (reflecting loss aversion).[33] They often pick up on trendy topics (the Baader-Meinhof effect), like recent efforts around

---

[33] *E.g.*, Charles R. Korsmo & Minor Myers, *The Structure of Stockholder Litigation: When Do the Merits Matter?*, 75 Ohio St. L.J. 829, 869–84 (2014) (identifying characteristics of early twenty-first-century class actions targeting M&A transactions, including the dominance of transaction size and the unimportance of the merger premium); Elliott J. Weiss & Lawrence J. White, *File Early, Then Free Ride: How Delaware Law (Mis)shapes Shareholder Class Actions*, 57 Vand. L. Rev. 1797, 1833–45 (2004) (describing characteristics of turn-of-the-millennium class actions targeting M&A transactions, including a bias towards larger issuers and deals with recognizable features).

ESG. What the aggregation of entrepreneurial firms lacks is any type of systematic and proactive enforcement agenda.[34]

Nor is the Company's discrete act approach limited to public corporations, where entrepreneurial plaintiffs' lawyers are watching. The same accrual framework would apply to private corporations, where it would be far easier for statutory violations to slip by.

To blunt the radical implications of its argument, the Company argues that a stockholder can still bring an as-applied challenge for breach of fiduciary duty.[35] True, but that is cold comfort. As discussed more extensively later,[36] a breach of fiduciary duty claim is not a substitute for a statutory claim. A breach of fiduciary duty claim examines whether fiduciaries have acted disloyally, in bad faith, or without sufficient care. If a provision is invalid under the DGCL, the appropriate claim is a statutory one. If a laches defense has eliminated the statutory challenge, a fiduciary challenge may be impossible.[37]

---

[34] *E.g.*, Charles R. Korsmo & Minor Myers, *Aggregation by Acquisition: Replacing Class Actions with A Market for Legal Claims*, 101 Iowa L. Rev. 1323, 1333–37 (2016) (describing agency costs associated with contemporary stockholder class action litigation).

[35] Def.'s Reply Br. at 11 ("Moelis stockholders remain free to bring as-applied claims challenging any specific implementation of the Stockholders Agreement as a *breach of fiduciary duty*.") (emphasis added).

[36] *See* Part II.B.3., *infra*.

[37] *E.g.*, *Hokanson v. Petty*, 2008 WL 5169633, at *1 (Del. Ch. Dec. 10, 2008) ("Given the plaintiffs' failure to mount a timely attack on the Buyout Option itself, they cannot state a breach of fiduciary duty claim by arguing that the Altiva board should have caused the corporation to commit a breach of contract."); *id.* at *6 ("The plaintiffs have cited no authority

The Company also cites a series of cases that it claims apply laches to bar statutory claims under a discrete act accrual regime.[38] The Company likes those cases because they contain snippets about the timing of accrual for challenges to a contract. But all of those cases involve as-applied fiduciary duty challenges to the decision to enter into the contract. None involved statutory challenges and assertions of ongoing illegality.[39]

The Company cites one case where the court applied the discrete act approach and dismissed a claim asserting that a stock issuance from fifteen years earlier was void for failing to comply with Section 152 of the DGCL.[40] The plaintiff argued correctly that the passage of time could not validate a void act, but did not cite any cases to support that assertion.[41] Meanwhile, the defendants cited cases about

---

suggesting that the Altiva directors were mandated to cause the company to breach a contract and avoid the Merger. On this basis alone, the motion to dismiss must be granted.").

[38] *See* Def.'s Opening Br. at 17; Def.'s Reply Br. at 9–11 (citing *HUMC Holdco, LLC* v. *MPT of Hoboken TRS, LLC*, 2022 WL 3010640 (Del. Ch. July 29, 2022); *In re Sirius XM S'holder Litig.*, 2013 WL 5411268 (Del. Ch. Sept. 27, 2013); *Kahn* v. *Seaboard Corp.*, 625 A.2d 269 (Del. Ch. 1993); *Tchrs.' Ret. Sys. of La.* v. *Aidinoff*, 900 A.2d 654 (Del. Ch. 2006)).

[39] One count of the complaint in *Sirius XM* asserted that a challenged provision in an investors agreement violated Section 141(a). 2013 WL 5411268, at *5. The court did not separately analyze the statutory challenge or consider whether either the potential for the agreement to be void or the ongoing nature of a statutory violation made laches unavailable.

[40] *See* Def.'s Opening Br. at 16–17; Def.'s Reply Br. at 6 (citing *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969 (Del. Ch. 2016)).

[41] *Kraft*, 145 A.3d at 988 ("Kraft provides no authority for the proposition that a plaintiff cannot lose a claim to void a transaction based on delay.").

16

*voidable* acts or where the court found the challenged action was not void.[42] The *Kraft*

decision relied on the defendants' precedents.[43] But cases addressing *voidable* acts

are not relevant to a *void* act. More recent Delaware Supreme Court precedent,

including last year's *Holifield* decision, makes clear that equitable defenses like

laches cannot validate void acts.[44] The *Kraft* decision is therefore unpersuasive.

By contrast, Delaware decisions have not used laches to cut off facial

challenges to the statutory validity of governance arrangements. In *Abercrombie v.

Davies*,[45] the defendants entered into the challenged governance arrangement on

---

[42] *See Id.* at 988 n.82. (citing *Beard v. Elster*, 160 A.2d 731, 739 (Del. 1960) and *Brown v. Fenimore*, 1977 WL 2566, at *2–3 (Del. Ch. Jan. 11, 1977)).

[43] The court also relied on a case cited by the plaintiff. *Id.* at 988 (citing *Bush v. Hillman Land Co.*, 2 A.2d 133, 137 (Del. Ch. 1938)). But *Bush* appears to have dealt with a transaction that the plaintiff argued was voidable, not just void. *See Bush*, 2 A.2d at 135 ("It may well be true, as the demurrants contend, that if the stock was issued without consideration, it was not void but only avoidable, and that it was accordingly permissible for the corporation to pursue the remedies provided in the General Corporation Law to enforce payment thereon for the benefit of creditors . . . .").

[44] *See Holifield*, 304 A.3d at 916; *CompoSecure, L.L.C. v. CardUX, LLC,* 206 A.3d 807 (Del. 2018).

The *Kraft* decision also relied on *Frank v. Wilson & Co.*, 32 A.2d 277, 301 (Del. 1943), cited in *Kraft*, 145 A.3d at 988 n.82. In *Frank*, the Delaware Supreme Court affirmed a ruling which held that a plaintiff had either ratified or acquiesced in a recapitalization that the Supreme Court had held to be void. *Frank*, 32 A.2d a 281, 283. Although *Frank* reached an equitable result given the facts of that case, using ratification or acquiescence to defeat a challenge to a void act conflicts with *Holifield* and *CompoSecure*.

[45] 123 A.2d 893 (Del. Ch. 1956), *rev'd on other grounds,* 130 A.2d 338 (Del. 1957).

March 30, 1950.[46] No one brought a facial challenge until after December 9, 1954.[47] Chancellor Seitz held the arrangement invalid.[48]

Likewise, in *Ebix*,[49] the plaintiffs contended that a provision in a CEO's employment agreement operated as an unreasonable antitakeover device.[50] The defendants argued the claim was time-barred because the agreement had been adopted and disclosed in public filings more than three years earlier.[51] The court rejected that argument, holding that a challenge to the adoption of the agreement was barred by laches, but the challenge to the "continued existence or subsequent implementation" of the agreement was "timely because the alleged injury [was] ongoing."[52]

More recently, in *Politan*, this court sustained a claim that an agreement was invalid under Section 141(a), even though it was executed more than three years before suit was filed.[53] Citing both *Collis* and *Ebix*, the court reasoned that accrual

---

[46] *Id.* at 895.

[47] *See id.*

[48] *Id.* at 900.

[49] *In re Ebix S'holder Litig.*, 2014 WL 3696655 (Del. Ch. July 24, 2014).

[50] *Id.* at *3, *7.

[51] *Id.* at *4, *11.

[52] *Id.* at *11.

[53] *Politan Cap. Mgmt.t LP v. Masimo Corp.*, C.A. No. 2022-0948-NAC, at 173–191 (Del. Ch. Feb. 3, 2023) (TRANSCRIPT).

should be measured under either the continuous wrong method or the separate-accrual method and that the claim was timely either way.[54]

As in *Politan*, the real choice is between the continuing wrong method and the separate accrual method. If a determination of invalidity had knock-on effects, then that choice could matter.[55] For the facial challenge in this case, the choice makes no difference. The Challenged Provisions remain in effect, so under either method, the facial challenge is timely.

### 3. Prejudice

Assuming laches were available, the defense fails for another reason as well: Laches requires a showing of prejudice.[56] "Laches is fundamentally concerned with the prevention of inequity in permitting a claim to be enforced. Inequity for this purpose arises where there occurs some change in the condition or relation of the parties or the property involved in the pending lawsuit."[57]

---

[54] *Id.* at 187–88.

[55] Assume a newly formed corporation specifies in its charter that 25% of the directors would constitute a quorum for conducting business. That violates Section 141(b) and is statutorily invalid. Envision a closely held corporation where no one thinks to sue for a decade, at which point a stockholder finally challenges the provision. Under the Company's discrete act approach, the provision could not be challenged. Under either a continuing wrong approach or the separate accrual approach, the provision could be challenged. The follow-on question is what happens to decisions the board made when only a 25% quorum was present. Under a continuing wrong approach, any decision during the past decade—the entire time the provision was in place—could be attacked. Under a separate accrual approach, the court would look backward from the date of suit, so absent tolling, only decisions within the past three years could be challenged.

[56] *Id.* at 1221.

[57] Wolfe & Pittenger, *supra*, § 15.07[c][4] at 15-81.

19

The Company has not pointed to any prejudice from any delay in filing suit. Nor could it. The facts are undisputed, so there can be no prejudice from the loss of evidence or faded memories. If anything, the Company has benefited from operating for ten years under its chosen (and, for present purposes, assumed-to-be illegal) governance arrangement. There is no reason to think that the timing of the suit puts the Company at any disadvantage.

### 4. Acquiescence In The Guise Of Unusual Conditions Or Extraordinary Circumstances

Finally, when conducting a laches analysis, a court may consider "unusual conditions or extraordinary circumstances."[58] "[I]f unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer period than that fixed by the statute" then a court may "determine the extraordinary case in accordance with the equities which condition it."[59]

The Company asserts that because its IPO prospectus described the Stockholders Agreement, and because the Company has repeatedly disclosed it since, the plaintiff and other stockholders "bought into" the Company's corporate governance regime and cannot now challenge it. Through this argument, the

---

[58] *Levey,* 76 A.3d at 770; *accord IAC/InterActiveCorp. v. O'Brien*, 26 A.3d 174, 178 (Del. 2011).

[59] *Wright v. Scotton*, 121 A. 69, 73 (Del. 1923).

Company invokes a species of acquiescence based on the act of purchasing shares. That theory has numerous problems.

The first is that acquiescence is an equitable defense.[60] Just as laches cannot validate a void act, acquiescence cannot either.[61]

A second problem is that the argument depends on a defense-friendly inference that the act of purchasing shares connotes agreement with a disclosed arrangement. Purchasers could just as easily believe that the law rendered the disclosed arrangement invalid such that they did not have to worry about it. Only the defense-friendly assumption supports acquiescence. The plaintiff-friendly assumption of reliance on the protection of the law does not. On a motion for summary judgment, the court must adopt the inference favoring the non-movant plaintiff.

---

[60] *Julin v. Julin*, 787 A.2d 82, 84 (Del. 2001).

[61] *Holifield*, 304 A.3d at 936 (affirming holding that because transfer of LLC units was incurably void under operating agreement acquiescence was unavailable as a defense.). Acquiescence is similar to an estoppel by conduct. *Lehman Bros. Hldgs. Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *9 (Del. Ch. Feb. 25, 2014). Estoppel cannot validate a void act either. *E.g.*, *STAAR Surgical*, 588 A.2d at 1137 ("the equitable doctrine of estoppel is inapplicable to agreements or instruments that violate either express law or public policy."); *Jackson v. Turnbull*, 1994 WL 174668, at *3 (Del. Ch. Feb. 8, 1994) ("Before addressing the statutory claims, it seems appropriate to consider defendants' estoppel argument. Defendants say that Jackson is estopped from challenging the merger since he approved it both as a director and a stockholder. This argument might be persuasive with respect to fiduciary duty claims. However, estoppel will not bar consideration of statutory violations such as those at issue here."), *aff'd*, 653 A.2d 306 (Del. 1994); 12B William Meade Fletcher, *Fletcher Cyc. Corp.* § 5862, Westlaw (database updated Sept. 2023) (reciting general rule that "if a contract is illegal and void because in violation of an express prohibition, or contrary to public policy, and not merely ultra vires, the fact that a shareholder voted for it as a director, or otherwise consented or participated, does not estop that shareholder from attacking its validity, . . .").

21

If a choice of inferences is necessary, then a system that prioritizes the rule of law should allow purchasers to rely on the protections the legal regime affords. A purchaser should not have to anticipate being bound by illegal arrangements. "Buyer beware" offers a coherent principle when the range of what the buyer can accept falls within the bounds of the law. "Buyer beware" should not protect conduct that exceeds the bounds of the law. Disclosures about legally non-compliant conduct therefore cannot insulate that conduct from challenge.[62]

A contrary result in which purchasing shares constituted acquiescence would enable a corporation to create its own body of law through its IPO prospectus. A corporation could implement any governance regime it wished, describe it in the prospectus, and argue that every stockholder who bought shares in the IPO had acquiesced to its terms. In that world, timeliness principles would become irrelevant because the act of purchasing shares would insulate the conduct from challenge. Delaware should not embrace that rule.

The existence of Section 327 of the DGCL suggests that absent a statutory amendment, Delaware does not equate the act of purchasing shares with acquiescence to illegal conduct. Section 327 of the DGCL imposes the contemporaneous ownership rule, under which a stockholder must have owned stock

---

[62] *See generally* Minor Myers, *The Corporate Law Reckoning for SPACs* (Aug. 2, 2022), SSRN: https://ssrn.com/abstract=4095220. Professor Myers applies this principle to disclosures about the conflicts of interest inherent in the structure of a SPAC. He argues that the duty of loyalty is a mandatory feature of Delaware law such that the disclosures cannot insulate conflicted transactions from challenge. *See id.* at 50–54. The same reasoning applies to governance structures that violate mandatory features of the DGCL.

when the corporation suffered the wrong to have standing to assert a derivative claim.[63] Section 327 bars a stockholder from suing derivatively for pre-purchase wrongs, effectively operating as a covenant not to sue for wrongs predating the purchase.[64] But even Section 327 does not go as far as the Company's acquiescence rule, because the statute does not absolve a corporation for all of its prior conduct. If a stockholder with standing files suit, then all stockholders—including after-acquiring stockholders—can benefit equally and indirectly from any derivative recovery.[65]

---

[63] For reasons that I have expressed elsewhere, I do not believe that a coherent and credible policy justification has ever been offered for the contemporaneous ownership requirement. *See* J. Travis Laster, *Goodbye to the Contemporaneous Ownership Requirement*, 33 Del. J. Corp. L. 673 (2008). The requirement was created by the Supreme Court of the United States to address the problem of collusive federal diversity jurisdiction. That problem never affected state courts, and both state courts generally and this court in particular consistently rejected the rule. *See Quadrant Structured Prods. Co., Ltd. v. Vertin (Quadrant I)*, 102 A.3d 155, 177–80 (Del. Ch. 2014) (collecting authorities). The Delaware General Assembly enacted Section 327 in 1945, after New York's implementation of a similar provision under circumstances that smack of anti-Semitism. *See Bamford v. Penfold, L.P.*, 2020 WL 967942, at *24 n.18 (Del. Ch. Feb. 28, 2020); Lawrence E. Mitchell, *Gentleman's Agreement: The Antisemitic Origins of Restrictions on Stockholder Litigation*, 36 Queen's L.J. 71, 72 & n.1 (2010). The ill-fitting justifications that subsequent courts have offered read like rationalizations, making Section 327 a provision that cries out for reexamination. *See SDF Funding LLC v. Fry*, 2022 WL 1511594, at *6 (Del. Ch. May 13, 2022) (calling for the General Assembly to revisit Section 327).

[64] *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 561 (Del. Ch. 2023).

[65] *In re Activision Blizzard, Inc. S'holder Litig. (Activision)*, 124 A.3d 1025, 1048 (Del. Ch. 2015) ("But for Section 327, it would be clear that both the right to assert the derivative claim and the ability to benefit from any recovery traveled with the shares when they were sold. The plain language of Section 327 only addresses the right to assert the claim. Nothing in Section 327 limits the ability to benefit from any derivative recovery. And achieving that result would be difficult. The recovery in a derivative action belongs to and is almost inevitably awarded to the corporation, so all current stockholders benefit, notwithstanding the contemporaneous ownership requirement.").

Delaware has not invented a common law contemporaneous ownership requirement for direct claims.[66] The right to assert a direct claim is a property right associated with the shares, so unless the seller and buyer agree otherwise, the ability to assert a direct claim and benefit from any remedy passes to the buyer with the shares.[67] By purchasing shares, a buyer does not acquiesce in the prior conduct giving

---

[66] *See Quadrant I*, 102 A.3d at 178 ("[M]any courts, including Delaware, did not follow the rule of the *Hawes* case [*viz.,* the contemporaneous ownership requirement].") (alteration in original) (quoting *Rosenthal v. Burry Biscuit Corp.,* 60 A.2d 106, 111 (Del. Ch. 1948) (Seitz, V.C.)); *Activision*, 124 A.3d at 1048 ("As in Delaware, a majority of jurisdictions refused to adopt a contemporaneous ownership requirement in the absence of a statute."); *see also id.* at 1250 ("Section 327 does not apply to direct claims."). *But see Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1169 (Del. Ch. 2002) (applying judicially created version of contemporaneous ownership requirement to direct claims as a matter of public policy).

For reasons discussed in more detail elsewhere, the *Omnicare* opinion is not persuasive. *See Activision*, 124 A.3d at 1051 n. 14. The *Omnicare* opinion asserted that before the adoption of Section 327, there was "a longstanding Delaware public policy against the 'evil' of purchasing stock in order 'to attack a transaction which occurred prior to the purchase of the stock.'" *Omnicare,* 809 A.2d at 1169 (quoting *Burry Biscuit*, 60 A.2d at 111). The *Omnicare* opinion also asserted that "[t]he policy against purchasing lawsuits involving the internal relations of Delaware corporations *was codified* in the derivative suit context by [Section 327]." *Id.* (emphasis added). As support, the *Omnicare* decision relied on *Burry Biscuit* and authorities traceable to *Burry Biscuit*. But on both points, *Burry Biscuit* said exactly the opposite. As to the state of the law before the adoption of Section 327, then-Vice Chancellor Seitz wrote: "Under the Delaware Law as it existed prior to the enactment of [Section 327], in order to maintain a derivative action, a stockholder was not required to be the owner of the shares at the time of the transaction of which he complained." *Burry Biscuit*, 60 A.2d at 111. As to the supposed codification of existing law, then-Vice Chancellor Seitz wrote that Section 327 "effected a substantial change in the Delaware Corporation Law." *Id.* The change was that before its passage, a stockholder could sue for wrongs pre-dating the acquisition of stock, but "[a]fter its passage, a stockholder filing a derivative action was required to allege and therefore to prove that he was a stockholder at the time of the transaction of which he complained, or that his stock devolved upon him by operation of law." *Id.*

[67] *Urdan v. WR Cap. P'rs, LLC*, 2019 WL 3891720, at *11 (Del. Ch. Aug. 19, 2019), *aff'd*, 244 A.3d 668 (Del. 2020).

24

rise to a direct claim. Instead, a buyer can challenge that conduct.[68] The same is true for the plaintiff as a buyer in this case.

The disclosure of the Stockholders Agreement does not constitute an extraordinary circumstance that results in laches barring the plaintiff's claim. If the Stockholders Agreement violates Section 141(a), then Delaware law protects the plaintiff and other stockholders from that arrangement. The plaintiff could not override that statutory prohibition and consent to an invalid arrangement through the act of purchasing its shares.

## B. Ripeness

Believing that its laches argument defeats the plaintiff's statutory challenge, the Company says all that remains is a potential claim for breach of fiduciary duty, if and when a breach occurs. But that claim is not yet ripe. Thus, as the Company sees it, the plaintiff sued too late to bring a statutory claim and sued too early to bring a fiduciary duty claim. The plaintiff therefore has no claim at all.

That argument attempts to defeat the claim the plaintiff filed by pointing to a claim the plaintiff did not file. The plaintiff is pursuing a facial statutory challenge, not a claim for breach of fiduciary duty. The plaintiff's statutory claim is ripe.

### 1. The Section 141(a) Claim Is Ripe.

"A ripeness determination requires a common sense assessment of whether the interests of the party seeking immediate relief outweigh the concerns of the court in

---

[68] *Urdan*, 2019 WL 3891720, at *11 ("[W]hen the shares are sold, the rights to assert and benefit from direct claims pass with the shares to the new owner.").

postponing review until the question arises in some more concrete and final form."[69]

"Generally, a dispute will be deemed ripe if litigation sooner or later appears to be unavoidable and where the material facts are static."[70]

The first step in making this common sense assessment is to identify "the legal questions in the case."[71] The Company frames the legal question as whether the defendants have breached their fiduciary duties. But the plaintiff is not bringing a claim for breach of fiduciary duty. Under Professor Berle's famous formulation,

> in every case, corporate action must be twice tested: first, by the technical rules having to do with the existence and proper exercise of the power; second, by equitable rules somewhat analogous to those which apply in favor of a *cestui que trust* to the trustee's exercise of wide powers granted to him in the instrument making him a fiduciary.[72]

Delaware follows the twice-testing formula.[73]

The first test—Berle I—looks to whether corporate action complied with "the hierarchical components of the entity-specific corporate contract, comprising (i) the Delaware General Corporation Law, (ii) the corporation's charter, (iii) its bylaws, and

---

[69] *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1217 (Del. 2014) (cleaned up).

[70] *Id.* (cleaned up).

[71] *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989).

[72] Adolf A. Berle, Jr., *Corporate Powers as Powers in Trust*, 44 Harv. L. Rev. 1049, 1049 (1931).

[73] *Coster v. UIP Companies, Inc.*, 255 A.3d 952, 960 (Del. 2021).

26

(iv) other entity-specific contractual agreements."[74] The second test—Berle II—involves equitable review and generally contends that fiduciaries breached their duties.

The two tests are distinct. As *Schnell* teaches, conduct can be legal (passing Berle I) but inequitable (failing Berle II).[75] As the all-holders rule and *Unocal* teach, conduct can be illegal (failing Berle I) and yet there could be situations where it would be equitable (passing Berle II).[76] The vast majority of corporate actions pass both Berle I and Berle II. Some, such as a deferred redemption provision in a stockholder rights plan, violate both Berle I and Berle II.[77]

The plaintiff has not asserted a Berle II challenge. The plaintiff has only asserted a Berle I challenge.

A facial challenge contends that an act is invalid under any set of circumstances.[78] It does not require factual development; it presents a pure question

---

[74] *Quadrant Structured Prod. Co., Ltd. v. Vertin (Quadrant II)*, 2014 WL 5465535, at *3 (Del. Ch. Oct. 28, 2014).

[75] *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971) ("[I]nequitable action does not become permissible simply because it is legally possible.").

[76] *Compare Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 958 (Del. 1985), *with* Securities Exchange Act of 1934, 17 C.F.R. § 240.14d-10.

[77] *Compare Mentor Graphics Corp. v. Quickturn Design Sys., Inc. (Quickturn I)*, 728 A.2d 25, 44 (Del. Ch. 1998) (enjoining deferred redemption provision as a breach of fiduciary duty), *with Quickturn Design Sys., Inc. v. Shapiro (Quickturn II)*, 721 A.2d 1281, 1283 (Del. 1998) (affirming *Quickturn I* on other grounds; holding that deferred redemption provision conflicted with Section 141(a)).

[78] *Delaware Bd. of Med. Licensure & Discipline v. Grossinger*, 224 A.3d 939, 956 (Del. 2020).

27

of law.[79] "Facial challenges to the legality of provisions in corporate instruments are regularly resolved by this Court."[80]

This court has rejected similar efforts to defeat facial challenges with ripeness arguments. In *Abercrombie*, the plaintiffs mounted a facial challenge to a provision in a stockholders agreement that the parties called the agents agreement.[81] As in this case, the defendants argued that "plaintiffs do not show that the Agreement has been or will be used and so their complaint should be dismissed as premature."[82] Chancellor Seitz held that the provision was facially invalid.[83]

This court rejected a similar ripeness argument in *Carmody v. Toll Brothers, Inc.*[84] The plaintiff mounted a facial challenge to the validity of a rights plan with a "dead-hand" feature that allowed only the incumbent directors who adopted the plan or their designated successors to redeem the rights.[85] The defendants argued that the challenges were not ripe until there was a specific hostile takeover proposal involving a proxy contest in which the acquirer sought to replace its own nominees *and* those

---

[79] *Solak v. Sarowitz*, 153 A.3d 729 (Del. Ch. 2016).

[80] *Lions Gate Entm't Corp. v. Image Entm't Inc.*, 2006 WL 1668051, *6 (Del. Ch. June 5, 2006).

[81] 123 A.2d at 895.

[82] *Id.* at 896.

[83] *Id.*

[84] 723 A.2d 1180 (Del. Ch. 1998).

[85] *Id.* at 1190–92.

nominees wanted to redeem the pill.[86] Justice Jacobs, then a Vice Chancellor, rejected that argument:

> Stripped of its bells and whistles, this argument boils down to the proposition that the adoption of a facially invalid rights plan, on a "clear day" where there is no specific hostile takeover proposal, can never be the subject of a legal challenge. Not surprisingly, the defendants cite no authority which supports that proposition, nor could they, since the case law holds to the contrary.[87]

Instead, he relied on *Moran*,[88] where the defendants argued that a facial challenge to the legal validity of the rights plan was not ripe until the directors faced a hostile bid and refused to redeem the rights.[89] Justice Walsh, then a Vice Chancellor, explained that the plaintiffs were "contesting the validity of the rights under the Delaware General Corporation Law," resulting in a ripe claim regardless of whether the rights were ever triggered.[90] Vice Chancellor Jacobs reached the same conclusion in *Toll Brothers*, holding that "the plaintiff's claims of statutory and equitable invalidity are ripe for adjudication."[91]

---

[86] *Id.* at 1187–88.

[87] *Id.* at 1188.

[88] *Moran v. Household Int'l, Inc.*, 490 A.2d 1059 (Del. Ch.), *aff'd*, 500 A.2d 1346 (Del. 1985), *cited in Toll Brothers*, 723 A.2d at 1188.

[89] *Moran*, 490 A.2d at 1072.

[90] *Id.*

[91] 723 A.2d at 1188; *accord In re Chrysler Corp. S'holders Litig.*, 1992 WL 181024, at *3 (Del. Ch. July 27, 1992) ("Clearly ripe is the complaint's claim for rescission of the board's December 14, 1990 amendments to the Rights Plan (including the trigger reduction), even absent an actual or threatened proxy contest.").

As in *Abercrombie, Moran,* and *Toll Brothers,* the plaintiff here seeks a declaration that the Challenged Provisions are facially invalid. That claim is ripe.

### 2. *Sample* Does Not Foreclose A Section 141(a) Claim.

Relying on *Sample v. Morgan,*[92] the Company next argues that a plaintiff *only* can bring an as-applied fiduciary challenge to a contractual arrangement. The *Sample* decision argued against Section 141(a) challenges, but it did not eliminate them.

The *Sample* litigation challenged self-interested actions taken by a company's top three executive officers. The plaintiffs primarily argued that the officers breached their fiduciary duties, but the plaintiffs also challenged a contract provision in a stock purchase agreement as a violation of Section 141(a).[93] The defendants moved to dismiss the complaint under Rule 12(b)(6).[94]

While denying the rest of the motion as frivolous, the court dismissed the Section 141(a) challenge.[95] After factually distinguishing three Section 141(a) precedents, the decision argued for abandoning the Section 141(a) framework entirely.[96] The court acknowledged Professor Berle's two-part test, but then asserted

---

[92] 914 A.2d 647 (Del. Ch. 2007).

[93] *Id.* at 660–61.

[94] *Id.* at 661.

[95] *Id.* at 671.

[96] *Id.* at 671 n.77.

that when reviewing contractual restrictions on board authority, "[r]ather than condemn[ing] such exercises in contracting as illegal, Delaware law uses equity, in the form of principles of fiduciary duty, to ensure that directors do not injure their corporations."[97]

As a practical matter, that approach would result in Delaware courts only applying the second part of Professor Berle's two-part test. Rather than twice-tested, corporate contracts would be once-tested.

*Sample*'s once-tested approach also did not account for the many cases that evaluated Section 141(a) challenges. The *Sample* decision only addressed three decisions. It did not discuss the Section 141(a) cases that have considered challenges to stockholder agreements,[98] director agreements,[99] rights plans,[100] merger

---

[97] *Id.* at 672.

[98] *Schroeder v. Buhannic*, 2018 WL 11264517, *4 (Del. Ch. Jan. 10, 2018) (ORDER) (rejecting interpretation of a stockholders agreement that would have enabled the stockholders to select the corporation's CEO as inconsistent with Section 141(a)); *Abercrombie*, 123 A.2d at 898–900 (holding voting mechanism in stockholders agreement was invalid under Section 141(a)); *see Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *5 (Del. Ch. Apr. 28, 2004) (rejecting direct, board level constraint in the course of ruling on a Section 220 demand and stating "[t]he directors are not free arbitrarily to pick and choose the shareholders to whom they will or will not make disclosure. Nor can the corporation be heard to defend such a practice on the basis that it has bound itself contractually not to make such disclosures. Arbinet's directors were not free to contract away disclosure obligations that they had a fiduciary duty to observe.").

[99] *E.g.*, *Chapin v. Benwood Found., Inc.*, 402 A.2d 1205, 1211 (Del. Ch. 1979) (invalidating an agreement in which the trustees of a Delaware non-stock corporation specified in advance who would succeed each trustee, effectively picking their own successors), *aff'd sub nom. Harrison v. Chapin*, 415 A.2d 1068 (Del. 1980).

[100] *E.g.*, *Toll Brothers*, 723 A.2d at 1189 (finding it reasonably conceivable that dead hand feature in rights plan violated Section 141(a) because the provision "would jeopardize a newly-elected future board's ability to achieve a business combination by depriving that

31

board of the power to redeem the pill without obtaining the consent of the 'Continuing Directors,'" which in turn "would interfere with the board's power to protect fully the corporation's (and its shareholders') interests in a transaction that is one of the most fundamental and important in the life of a business enterprise."); *Quickturn II*, 721 A.2d 1291 ("In this appeal, Mentor argues that the judgment of the Court of Chancery should be affirmed because the Delayed Redemption Provision is invalid as a matter of Delaware law. According to Mentor, the Delayed Redemption Provision, like the 'dead hand' feature in the Rights Plan that was held to be invalid in *Toll Brothers,* will impermissibly deprive any newly elected board of both its statutory authority to manage the corporation under 8 *Del. C.* § 141(a) and its concomitant fiduciary duty pursuant to that statutory mandate. We agree." (cleaned up)); *UniSuper Ltd. v. News Corp.*, 2005 WL 3529317, *6 n.49, *8 (Del. Ch. Dec. 20, 2005) (holding that that the alleged contract was not invalid under Section 141(a) because it gave power to the stockholders as a whole, but noting that "[p]rivate agreements between the board and a few large shareholders might be troubling where the agreements restrict the board's power in favor of a particular shareholder, rather than in favor of shareholders at large.").

agreements,[101] a management agreement,[102] CEO employment agreements,[103] and stockholder-adopted bylaws,[104] plus assorted other scenarios involving allegedly improper delegations of authority.[105]

---

[101] *Nagy v. Bistricer*, 770 A.2d 43, 60–62 (Del. Ch. 2000) (holding that board abdicated its duty to determine consideration for merger by approving a merger agreement that did not specify the consideration stockholders would receive, providing instead that the acquirer would determine the amount after consulting with a financial advisor); *ACE Ltd. v. Cap. Re. Corp.*, 747 A.2d 95, 106 (Del. Ch. 1999) (finding plaintiff had shown a reasonable probability of success regarding the invalidity of a provision that prohibited a board from talking with a third-party bidder unless counsel opined in writing that the board's fiduciary duties required it; noting that the provision "involves an abdication by the board of its duty to determine what its own fiduciary obligations require at precisely that time in its life when the board's own judgment is most important"); *Jackson v. Turnbull*, 1994 WL 174668 (Del. Ch. Feb. 8, 1994) (holding that by approving a merger agreement that provided for stockholders to receive a specified amount per share in cash, unless an appraisal by a financial advisor resulted in a higher valuation, in which stockholders would receive the higher amount, the board had improperly delegated to the appraiser a decision that the board was obligated to make), *aff'd*, 653 A.2d 306 (Del. 1994).

[102] *In re Bally's Grand Deriv. Litig.*, 1997 WL 305803, at *5–6 (Del. Ch. June 4, 1997) (holding that stockholder plaintiff had stated a viable challenge to a management agreement on an improper-delegation theory).

[103] *Grimes v. Donald (Grimes II),* 673 A.2d 1207, 1214–15 (Del. 1996) (affirming dismissal of claim that the financial consequences of terminating the CEO and paying him his contractual severance were so great as to deprive the board of its ability, as a practical matter, to manage the corporation under Section 141(a)); *Politan*, C.A. No. 2022-0948-NAC, at 173–91 (holding challenge to CEO's employment agreement under Section 141(a) stated a claim because it was reasonably conceivable that where the company faced a proxy contest and the agreement provided that if only one-third of the board was replaced (amounting to two directors), then the CEO would be entitled to a severance payment of approximately $1 billion, comprising shares equal to 5% of the corporation's equity plus cash severance payments, the threat of that consequence prevented the board from nominating new directors in response).

[104] *CA, Inc. v. AFSCME Empls. Pension Plan*, 953 A.2d 227, 238 (Del. 2008) (holding that bylaw "as drafted, would violate the prohibition, which our decisions have derived from Section 141(a), against contractual arrangements that commit the board of directors to a course of action that would preclude them from fully discharging their fiduciary duties to the corporation and its shareholders."); *Gorman v. Salamone*, 2015 WL 4719681, *5 (Del. Ch. July 31, 2015) (holding that bylaw permitting a majority of stockholders to remove and replace corporate officers, including the CEO, was invalid under Section 141(a)).

33

The *Sample* decision is an outlier. It did not eliminate the ability to bring

Section 141(a) challenges. The defendants cannot rely on *Sample* to assert that the

plaintiff has no Section 141(a) challenge to bring.

---

[105] *See McMullin v. Beran*, 765 A.2d 910, 924–25 (Del. 2000) (holding that complaint stated a claim that corporation improperly delegated to its controlling stockholder the task of initiating, negotiating, and approving a sale of the company to a third party); *In re Pattern Energy Gp. Inc. S'holders Litig.,* 2021 WL 1812674, *59–61 (Del. Ch. May 6, 2021) (holding that plaintiff had stated an improper delegation claim by alleging facts supporting inference that directors delegated the preparation of a proxy statement to conflicted officers and did not review it before filing); *Rich v. Yu Kwai Chong*, 66 A.3d 963, 979 (Del. Ch. 2013) (holding that complaint stated a claim that board had abdicated its responsibilities by failing to conduct meaningful investigation into a demand and instead allowing management to make decisions regarding the demand without oversight); *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 278 (Del. Ch.2003) (holding that complaint stated a claim for breach of the duty of loyalty and action not in good faith where it alleged that board failed to act on executive's compensation and abdicated decision-making responsibility to the company's CEO); *In re Ply Gem Indus., Inc. S'holder Litig.*, 2001 WL 755133, at *10–11 (Del. Ch. June 26, 2001) (finding it reasonably conceivable that board improperly delegated task of negotiating merger agreement to CEO, chairman, and owner of more than 25% of the stock); *Sealy Mattress Co. of N.J. v. Sealy, Inc.*, 532 A.2d 1324, 1338 (Del. Ch. 1987) (holding that board "could not abdicate its obligation to make an informed decision on the fairness of the merger by simply deferring to the judgment of the controlling stockholder . . . ."); *see also Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 127 (3d Cir. 1998) (applying Delaware law, rejecting improper delegation challenge where board delegated its authority to administer and amend the corporation's retirement benefits plan to a corporate officer); *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 943 (Del. 1985) (rejecting improper delegation challenge where parent and subsidiary corporations negotiating a merger delegated to an engineering firm the task of preparing reserve estimates, selecting prices, costs, and risk factors, and creating valuations for the parties to use in negotiations); *Aldina v. Intenet.com Corp.*, 2002 WL 31584292, at *7 (Del. Ch. Nov. 7, 2002) (rejecting challenge that board improperly delegated task of conducting preliminary negotiation of transaction to CEO without forming special committee to oversee process); *Emerald P'rs v. Berlin*, 2001 WL 115340, at *21 (Del. Ch. Feb. 7, 2001) (subsequent history omitted) (rejecting improper abdication claim where the board delegated to a financial advisor "the task of *recommending*—not deciding—the exchange ratio" and reserved for themselves the decision on what exchange ratio to adopt); *State of Wisconsin Inv. Bd. v. Bartlett*, 2000 WL 238026, at *4 (Del. Ch. Feb. 24, 2000) (rejecting improper delegation challenge to board's decision to allow CEO to lead merger negotiations); *Canal Cap. Corp. v. French*, 1992 WL 159008, at *3 (Del. Ch. July 2, 1992) (rejecting improper delegation challenge where board hired management firm to manage company's investments while retaining ability to fire manager by cancelling contract at any time).

34

**3.** **The Possibility Of A Future Fiduciary Duty Claim Does Not Prevent A Plaintiff From Pursuing A Ripe Section 141(a) Claim.**

As discussed previously, a statutory Berle I claim and an equitable Berle II claim are separate and distinct. The Company argues that there is no need for a Berle I claim because of the possibility of a fact-specific Berle II claim. But a Berle II solution cannot solve a Berle I problem.

Chancellor Allen emphasized the distinctive nature of the two claims in *Grimes I*.[106] There, a plaintiff contended that a CEO's employment agreement violated Section 141(a) by preventing the board from overseeing and, if necessary, terminating him.[107] The defendants tried to recharacterize the claim as a derivative action for breach of fiduciary duty that should be dismissed under Rule 23.1.[108] Chancellor Allen rejected that characterization:

> Whether these contracts do violate Section 141 is a question of law directly concerning the legal character of the contract and its effect upon the directors. The question whether these contracts are valid or not does not fall into the realm of business judgment; it cannot be definitively determined by the informed, good faith judgment of the board. It must be determined by the court.[109]

---

[106] *Grimes v. Donald (Grimes I)*, 1995 WL 54441 (Del. Ch. Jan. 11, 1995) (subsequent history omitted).

[107] *Id.* at *1. There were actually three inter-related agreements, but it is easier to frame the issue as if they were all part of a single employment agreement.

[108] *Id.* at *7.

[109] *Id.*

35

By contrast, Chancellor Allen agreed that the fiduciary duty challenges to the agreement were subject to Rule 23.1, and he dismissed them on that basis.[110]

As the *Grimes* decision illustrates, a Berle I challenge and a Berle II challenge rest on different premises. The equitable Berle II challenge asserts that the directors breached their fiduciary duties of loyalty and care by acting in bad faith, making decisions when they were self-interested or not independent, or by acting in a grossly negligent manner. The Berle II claim focuses on what the directors knew, believed, and intended. It turns primarily on their subjective mental state.

A statutory Berle I claim turns on an objective comparison of the challenged arrangement with Section 141(a). Recall the hypothetical in which a Delaware corporation included a provision in its charter or bylaws that purported to bar stockholders from inspecting books and records in the manner provided for by Section 220. Assume the Company disclosed the arrangement, and it went unchallenged for three years. If directors rely on the provision to refuse a books and records request, then the proper challenge is not to argue that the directors acted disloyally, carelessly, or in bad faith. The directors might well have been disinterested and independent, believed that they could invoke the provision, and relied on the advice of counsel under Section 141(e). The proper challenge is that the provision was never valid in the first place.

---

[110] *Id.* at *8.

36

For a Section 141(a) violation, mental state does not matter. If Section 141(a) bars that provision, then the directors cannot agree to it. A Delaware citizen might similarly believe, honestly and in good faith, that buying a stranger-originated life insurance policy would be the best investment for her portfolio. The investment is still illegal.[111]

A Berle II challenge thus cannot substitute for a facial challenge because they invoke different principles and do different things. One enforces statutory requirements. The other enforces fiduciary obligations.

A Berle II challenge also cannot provide a substitute for a facial challenge in this case because the effects of the Challenged Provisions can be subtle, and a stockholder plaintiff might never know about the breach. Stockholders do not have a live feed of board deliberations so they can observe what is going on. Stockholders must rely initially on the Company's public disclosures and, if they can establish a proper purpose for obtaining them, books and records under Section 220.

Before a stockholder could have a basis to sue for a Berle II claim, the stockholder would have to learn that an issue had arisen. But the Company is unlikely to disclose anything short of an open conflict between the Board and Moelis that resulted in Moelis invoking the Challenged Provisions. If the directors asked informally about whether Moelis would support a particular course of action, knowing that he can withhold approval if he disagrees, that exchange is unlikely to be

---

[111] *See generally Wells Fargo Bank, N.A. v. Est. of Malkin*, 278 A.3d 53 (Del. 2022).

disclosed. If the directors knew the aperture of Moelis's Overton Window from their ongoing interactions with him, they would not even have to ask. Once again, no disclosure.

Without an all-out fight, a stockholder is unlikely to have any reason to seek books and records. A stockholder might suspect that the Challenged Provisions were constraining the Board, but "merely offering a suspicion of wrongdoing is not enough to justify a Section 220 demand."[112] Assuming the stockholder could show a proper purpose, the formal books and records would be unlikely to shed light on interactions short of a major blow-up. The evidence of informal interactions would have to come from electronic communications or depositions. A stockholder has to have good reason to obtain the former in response to a Section 220 request.[113] It would take an exceptional case for a court to order a substantive deposition as a result of a Section 220 proceeding.

A situation in which the directors opt not to pursue a course of action because of the likelihood that Moelis would not approve thus will be virtually impossible to detect and more difficult to investigate. That undercuts the effectiveness of the Company's Berle II solution.

---

[112] *Haque v. Tesla Motors, Inc.*, 2017 WL 448594, at *4 (Del. Ch. Feb. 2, 2017).

[113] *See, e.g.*, *KT4 P'rs LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 752–53 (Del. 2019) ("[T]he Court of Chancery should not order emails to be produced when other materials (*e.g.*, traditional board-level materials, such as minutes) would accomplish the petitioner's proper purpose, but if non-email books and records are insufficient, then the court should order emails to be produced." (footnotes omitted)).

38

And that is not all. Substantial uncertainty exists as to whether a stockholder could bring a viable fiduciary duty claim against Moelis for exercising the Challenged Provisions under Delaware precedent. One line of Delaware cases refuses to consider contractual rights when assessing controller status.[114] Moelis could argue with a straight face that given his level of equity ownership, he does not currently owe fiduciary duties as a controller. Assuming a stockholder cleared that hurdle, another would loom in the form of a line of Delaware cases about the ability of fiduciaries to exercise contractual rights. Those decisions assert that a fiduciary does not owe fiduciary duties when exercising contractual rights, even if the counterparty is the fiduciary's beneficiary.[115] Meanwhile, the directors could rely on precedent suggesting that they could not breach their duties by complying with (i.e., not

---

[114] *See, e.g., In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 995 (Del. Ch. 2014*), aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015) ("Here, there are no well-pled facts from which it is reasonable to infer that KKR could prevent the KFN board from freely exercising its independent judgment in considering the proposed merger or, put differently, that KKR had the power to exact retribution by removing the KFN directors from their offices if they did not bend to KKR's will in their consideration of the proposed merger.").

[115] *See, e.g., Odyssey P'rs, L.P. v. Fleming Cos., Inc.*, 735 A.2d 386, 415 (Del. Ch. 1999) ("Chancellor Allen found that Fleming was not constrained by fiduciary duties when acting as a creditor in relation to the foreclosure sale. . . . In my view, this rationale applies with equal force both to the claim that Fleming was obligated to pay a fair price in the foreclosure sale and that it (or Lawson) was obliged to disclose to ABCO's directors its analyses of ABCO's value to it. Fleming was not acting in a fiduciary capacity when it bid at the foreclosure sale and, thus, its conduct thereat is not subject to a fiduciary duty analysis."); *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, *5 (Del. Ch. Aug. 25, 2006) ("Here, ReliaStar is alleged to have taken advantage of its contractual rights for its own purposes. Without more, that is not sufficient to allege that ReliaStar is a 'controlling shareholder' bound by fiduciary obligations.").

breaching) the Stockholders Agreement.[116] While other authorities exist that could support a breach of fiduciary duty claim, it is far from clear that a Berle II claim would exist.

Given all of these difficulties, the Company's Berle II solution is likely no solution at all. The facial Berle I challenge is ripe, and the plaintiff can bring it.

## III. CONCLUSION

The Company's timeliness defenses do not provide a basis for granting summary judgment in its favor. The plaintiff has not sued too late. Nor has the plaintiff sued too early. The Company's motion for summary judgment on its laches and ripeness defenses is denied. Judgment on those defenses will be entered in favor of the plaintiff at an appropriate time—after the decision on the merits has been issued.

---

[116] *E.g.*, *Halifax Fund, L.P. v. Response UGA, Inc.*, 1997 WL 33173241, at *2 (Del. Ch. May 13, 1997) ("[T]here is no Delaware case that holds that the management of a Delaware corporation has a fiduciary duty that overrides and, therefore, permits the corporation to breach, its contractual obligations."); *Corwin v. DeTrey*, 1989 WL 146231, at *4 (Del. Ch. Dec. 4, 1989) ("[T]he directors of the selling corporation are not free to terminate an otherwise binding merger agreement just because they are fiduciaries and circumstances have changed."); *see also C & J Energy Servs., Inc. v. Miami Gen. Empls.'*, 107 A.3d 1049, 1072 (Del. 2014) (instructing trial courts not to divest third parties of their contract rights absent a sufficient showing that the contract resulted from a fiduciary breach and that the counterparty aided and abetted the breach).